PG1. Clerk of Court Office

United States Court
For the District of Columbia

RECEIVED
Mail Room
NOV 17 2011
United States Court of Appeals
District of Columbia Circuit

11-5191

C.V. no. 09-1027 (RJL)
No. 09-5128

In Re Antoine Jones

1:05-CR-0386-ESH

4-69

Writ of mandamus to Petitioner 60(B) motion in the District court.

Petitioner is letting the clerk of court office know that the printer and copy machine here at USP-Lee Law library toner is out of ink to further notice.

Petitioner is Humbly Requesting leave to file this Writ of mandamus to Petitioner 60(B) motion in the District court.

The 16-page motion Petitioner has submitted shows the toner-ink is low, so Petitioner didn't get a chance to send a copy of the motion or exhibits to the Government. The copier machine might be down for a while.

If possible can the clerk of court forward a copy to the Defendants.

Also, can you please let Petitioner know did the clerk office receive $450.00

P 02

for this 11-5191 -- count fee, and can petitioner ~~know~~ get a receipt for this writ of mandamus motion.

## Request for counsel

Petitioner is unexperience and a layman of the law. without Resources to properly prepare to argue a professional litigation in this court of appeal and Requesting for an assistant of counsel.

Counsel and amicus anthony shelley has already litigate this case and familiar with petitioner arjument, who would be a good candidate to Represent petitioner in this appeal.

Thank you very much

Antoine Jones                Date 11-14-2911
18600-016
USP-Lee
PO Box 305
Jonesville VA 24263



RECEIVED
Mail Room

NOV 17 2011

United States Court of Appeals
District of Columbia Circuit

CLERK OF COURT OFFFICE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

11-5191

~~United States~~                        1:05-cr-00386-ESH

~~Apelles~~                              cv. no. 07-1027 (RJL)

~~v.~~                                   NO. 09-5128

~~Antoine Jones~~       In Re Antoine Jones


## WRIT OF MANDAMUS TO PETITIONER 60 (b) MOTION IN THE DISTRICT COURT.

Petitioner has filed a 60 [b] motion [dishonesty and fraud on the court by the defendants] in the cv-no-1027 (RJL) and in No. 09-5128; the District Court denied petitioner leave to file this 60 (b) motion in the District Court.

District Court erred and prejudice petitioner by not allowing petitioner to submit facts of clear and convincing evidence that the defendants committed fraud on the court and violated petitioner 4th amendment rights, thus the District Court could set aside judgment under rule 60 [b].[1]

Petitioner has paid the full court filing fee $450 in no.11-5191 to re-visit this court of appeals to show clear and convincing evidence that A.U.S.A. Rachel C.

---

[1] For purpose of F.R. CR. 60 (b) provision that judgment may be set aside fraud upon court, one species of fraud upon court occurs when officer of court perpetrate fraud affecting ability of court or jury to impartial judge a case. See Pumphrey v. K.W. Thompson tool company, 62 F.3d 1129,( 1995 CA. 9 Idaho)

1

Lieber an officer of the court committed fraud on the court in petitioner criminal case (05-0386), civil case no. 07-01027-RJL, civil appeals no. 09-5128, direct appeal no. 3034, the district court error when the court didn't review the claims that A.U.S.A. Rachel C. Lieber committed fraud on the court, concealing the facts and evidence the defendants violated petitioner 4th amendment right. Petitioner will brief this motion to focus on the fraud on the court claims.

AUSA Rachel Lieber is a sworned officer of the court and a government lawyer for the United States Attorney Office of the United States Department of Justices and Ms. Lieber professional duty is to be honest and never to commit any type of fraud upon the court.

## TITLE III 2510 VIOLATION AND ILLEGAL LISTENING TO PETITIONER D.C. JAIL CONVERSATION

Petitioner counsel Mr. Balarezo move to suppress petitioner illegal D.C. Jail calls to show and prove the government violated his 4th Amendment rights, and illegally obtained petitioner D.C. Jail calls.

During petitioner criminal proceeding, district court civil proceeding, and in petitioner direct appeals proceedings, defendant AUSA Rachel Lieber conceal that the government received shipment of petitioner D.C. Jail calls and listen to volumes of petitioner D.C. Jail conversation without a warrant, subpoena or any type of legal court order.[2]

Instead of the government conceding that they did receive and listen to all the volumes of petitioner D.C. Jail conversation without court authority, the

---

[2] In Jones motion to suppress D.C. Jail calls Jones writes: Jones also move to suppress these calls because , upon information and belief, the government did not obtain these calls pursuant to a lawfully authorized subpoena or warrant.

government (AUSA Rachel Lieber) instead committed fraud on the court by being dishonest and deceiving the court.

In document 380, filed August 22, 2007, page 17, the government writes: the affidavits laid out a number of phone calls Jones had made while incarcerated at the D.C. Jail (then the government refer to footnote 7) footnote 7: reads Jones in a footnote to his motion without any supporting authority, suggest that these conversations should be suppressed because they were not obtained with a subpoena or warrant. Def. mot. at 371 N.1. The conversation at issue are recording made, by the jail of conversation on phones used by prisons kept in the hands of jail officials as part of a public policy of monitoring inmate calls, including signs above the phones indicating that they may be recorded. (The fraud, dishonesty and deception start here). **"It is difficult to understand how Jones could have any protected fourth amendment interest in these recording and title III specifically exclude this kind of monitoring from its coverage. Smith v. Department Of Correction 251 F.3d 1047 (D.C. Cir. 2001).**

The government here wrongfully contends that the D.C. Jail authority, by recording the conversation of petitioner and allowing the government to intercept those communication it was law Ful and authorized.

There's no doubt that D.C. Jail administration could monitor and listen to petitioner conversation but what defendant AUSA Lieber and defendant (Warden) Dennis Harrison over looked, the point that petitioner D.C. Jail conversation were sensitive" and both defendant Lieber and Harrison disregarded Department Of Correction program statement (monitoring and recording inmate telephones)[3]

---

[3] PS 4070 13(e), call data records and recording of **inmate telephone calls are considered sensitive** and *shall not be released without a subpoena or other appropriate legal order.* (EXHIBIT 1).

3

Petitioner submits 64 of petitioner recorded D.C. Jail calls, the government illegally obtained, and listens to them. (Exhibit 2)

## ILLEGAL LISTENING TO PETITIONER D.C. JAIL CONVERSATION BY DEFENDANT LIEBER, DEFENDANT HORNE AND THE GOVERNMENT

### STATEMENT OF FACTS

The defendant's and the government has admitted and conceded that they have receive shipment of petitioner D.C. Jail calls and listen to volumes of petitioner D.C. Jail conversation which is cleanly a fourth amendment violation by the defendants because they didn't have any legal court authority.[4]

(Exhibit 3) F.B.I. agent Stephanie Yanta November 22, 2005, grand jury proceeding, pages 12-16.

Page 12 Lines 24, 25:

(Q) Okay. And finally I want to direct your attention to some recent telephone contact from the D.C. Jail. Are you aware that Antoine Jones is currently house at the D.C. Jail?

(A) Yes.

Page 13 Lines 1-12:

(Q) Okay. And are you aware that we have received recording of telephone conversation by Mr. Jones at the D.C. Jail?

(A) Yes.

---

[4] 2520(a) Recovery of civil damages authorized. **In general.** Except as provided in section 2511 (2) (a)(iii) [18 USCS § 2511(2)(a)(iii)], any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter [18 USCS§§ 2510 et seq.] may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

4

(Q) Okay. Has Mr. Jones—and I want to confine—well, let me say this. Have we gotten another shipment of phone calls?

(A) Yes.

(Q) Okay. Did we just get them very late last night?

(A) Yes we did.

Page 15 Lines 8-12:

(Q)Grand juror. I just have one. Is it a common practice to monitor phone, calls from when they're housed in jail? **Is that legal?**

(A) Witness. It is legal. We **actually have to subpoena them.**[5]

(Exhibit 4) M.P.D. detective **Norma Horne false and deceiving November 22, 2005, affidavit for petitioner D.C. Jail search. Page 3 Norma Horne write: review of intercepted call's placed by Antoine Jones from D.C. Jail.**

On page 11, intercepted telephone calls section, Norma Horne writes and conceded that she review conversation on Ms. Deborah O'Neal from November 3,2005, at approximately, 9:16 P.M. and November 6, 2005, approximately 11:57 A.M. and Norma Horne explained Ms. O'Neal and petitioner conversation, in details. Then on page 12 of her false affidavit she writes on petitioner and his wife Deniece Jones, conversation. Yes, detective Horne receive and listen to these D.C. Jail conversation without a warrant, subpoena or legal court order, violating petitioner fourth amendment rights.

(Exhibit 5) Lawrence Maynard, **November 29, 2005, detention hearing**

---

[5] Since agent Yanta or the government didn't get **a subpoena or any legal court authority, this conduct is deem** perjury and fraud

5

Page 9 Lines 14-22, the government write: The government has come into possession of some intercepted telephone calls from the jail, from D.C. Jail by Antoine Jones to, in particular, one of his girlfriends. There are a few telephone calls with her and, to be quite honest we have not actually gotten through all of the jail calls because there're voluminous.

Page 21 Lines 10-12,

Government writes: and I will note also, your honor that in other intercepted jail calls Mr. Jones speaks at length with his wife about Mr. Maynard.

In AUSA Rachel Lieber December 5, 2005, letter to Mr. Balarezo, petitioner counsel, Ms. Lieber, informed counsel that she receives petitioner jail calls[6].

(Exhibit 6) During the legal interrogation of Ms. Deborah O'Neal, AUSA Rachel Lieber admitted she listen to petitioner and Ms O'Neal conversation.

Page 1,

(Q)Ms. Lieber. We have listened to a lot of phone conversation between you and Antoine.

Page 2,

(Q)Ms Lieber. November 3. Which is the first call that Antoine made to you from jail?

---

[6] Via letter dated December 5, 2005 AUSA Lieber informed counsel that: as I mentioned, in early November, we received information through various channels, including agents wholly unrelated to this investigation that [Jones] was attempting to identify witnesses against him and take care of them. Based on this information, **"we obtained copies of all calls your client made from D.C. Jail".**

(Q)Ms Lieber. We listen to another **one of his calls with a female caller who said** that she was shock.

(Q)Ms Lieber, on another call (Nov. **6), that he made to you from jail. He told you** that if any letters come to your house **from him with someone else name on it. You** should hold it for Lawrence and he **would get them from you.**

Page 4

(Q)Ms Lieber. In another phone **call that he made to you. When he was talking** about selling the club to a guy from **down the waterfront**

Page 6

(Q)Ms Lieber. In one of his phone **calls to you what did he mean when he said I've** got to be strong, because if I break **down, then it will be a domino effect, what did** he mean by that?

(Q)Ms Lieber. In one of his earlier **conversation with you he said that they let** Adrian go, but then the judge change **her mind, what was that about?**

(Q)Ms Norma Horne. In another **phone conversation that you had with Antoine** what did you think that he meant **when he said that his wife was the only one who** stood by him when he was in prison?

Ms Lieber, re-entered the **room and told Ms. O'Neal that it was her lucky** day and that they weren't going to **waste the grand jury's time, their time or Ms.** O'Neal any longer, but they had **confirmed some things that they wanted to know** by talking to Ms. O'Neal and that **they was going to listen to the (D.C. Jail) tapes**

some more and if they come across **anything that I wasn't being truthful about then** Ms Lieber would have to bring perjury **charges against Ms. O'Neal.**[7]

(EXHIT 7) Government's supplemental **filing concerning conditions of** confinement, filed 3-23-06- document **93.**

Page 1,outline of evidence, jail calls-section, the government writes: On the course of his incarceration at District of **Columbia jail, Jones has made numerous of** telephone calls, which were recorded **by the jail. Among those calls were several to** Beverly Johnson.

Page 2, the government writes. In **one call at 10:10 pm on November 3, 2005.In** foot note 1, the governments discuss **conversation with Deborah O'Neal and** discuss conversation with petitioner **and petitioner wife Deniece Jones.**

(Exhibit 8) Even in the government's **opposition to appellant prose motion** for release pending the government **filing a writ of certiorari and motion to extend** the stay of the mandate in this case, **on page 14,the government writes: In addition,** the government proffered that based **upon witness information " a review of** appellant's telephone conversation **from jail.**[8]

Petitioner has point out numerous **of times AUSA Rachel Lieber and the** government admit or conceded that **they receive and listen to petitioner DC jail** calls, and with one crucial question **(Did the government obtained a subpoena,**

---

[7] Ms Deborah O'Neal was subpoena to testified in front of the grand jury but MS Lieber intercepted MS O'Neal from going into the grand jury and MS Lieber and her investigators illegally interrogated MS O'Neal for almost two hours denying her access to the grand jury because they learned of exculpatory evidence that contradict the government bogus theory that petitioner was committing obstruction of justice, this is a clear violation of rule 17,citing Burbin V. UNITED STATES 94 US APP DC 415, 221,F.2D 520 1954 [DC CIR].

[8] In government 's opposition to appellant's motion for release pending new trial and supplement to motion for leave to file motion for release, on page 7, the government repeated and wrote the same exact identical words (Exhibit 9) '

warrant or any legal court order to received and listened to petitioner conversation?)This court will finally have the clear and convincing evidence petitioner due diligently tried to present in the courts.

## Illegal entry and Illegal search of **petitioner DC jail cell on December 2 2005** By unknown name FBI agents.

Petitioner has been due diligently complaining that some unknown-name F.B.I. agents unlawfully enter and **unlawfully search petitioner D.C. Jail cell on** "December 2, 2005"

Petitioner submitted a sworn declaration under penalty of perjury, explaining that it cellmate, the sergeant on duty, **the correction officer's who took petitioner** to segregation-solitary confinement "all" told petitioner that some F.B.I. agent enter and search petitioner cell on December 2, 2005. Mr. Tracey McKeithon-petitioner cell-mate confirmed the searchers were the F.B.I. because they introduce their selves as F.B.I. agents who were there to search petitioner property and petitioner area of the cell. (Mr. McKeithon also stated the agent's confiscated document from petitioner personal property violating petitioner fourth amendment right because they did not have a search warrant).[9]

AUSA Rachel Lieber committed fraud on the court when she duck, dodge and avoid answering the question if the F.B.I. agents unlawfully enter and unlawfully search petitioner cell on December 2, 2005, page 7 of the court of appeals (no. 09-5158) civil proceeding, Ms Lieber writes: **"Jones made further, conclusory, allegation about Lieber, relating to the government's search of his cell, but these allegations are not at issue here. (Id. at 4 A. 118)**

---

[9] Searches without a warrant 18 U.S.C. 2236 ( Whoever, being an officer, agent, or employee of the United States or any department or agency thereof, engaged in the enforcement of any law of the United States, searches any private dwelling used and occupied as such dwelling **without a warrant** directing such search, or maliciously and without reasonable cause searches any other **building or property without a search warrant**, shall be fined under this title for the first offense; and, for a subsequent offense, shall be fined under this title or imprisoned not more than one year, or both.

Petitioner has point out that some unknown-name F.B.I. agents unlawfully search his D.C. Jail cell on December 2, 2005, with another crucial question from this court to A.U.S.A. Lieber, (*Did Ms. Lieber F.B.I. investigators unlawfully enter and unlawfully search petitioner D.C. Jail cell on December 2, 2005?*)

And with her truthful answer, the court will have clear and convincing evidence that A.U.S.A. Lieber had conceal this December 2, 2005, unlawful search for years, and clearly committed fraud on the court to cover up petitioner fourth amendment violation by the unknown-name F.B.I. agents, in the numerous of courts.

The government theory **was complete with rumors, hearsay and a fabricate story.**

AUSA Rachel Lieber escalated this fabricated story when she sent a false-bogus memorandum to D.C. Jail trying to pass it off as a court order.

AUSA Rachel Lieber memorandum was completed with rumors, hearsay and fabrication. (EXIBIT 10)

In this bogus memorandum AUSA Rachel Lieber requested petitioner to be place on lock down on November 23, 2005, and renewed her request on December 2, 2005, the day D.C. Jail administration place petitioner in South 1 maximum security unit- solitary confinement, under total separation status, strip from his due process privileges (no. social visits, no incoming mail privileges, no phone privileges), petitioner wasn't allowed to called his criminal attorney- Mr. Balarezo).

In Ms Rachel Lieber bogus memorandums, in FBI agent Stephanie Yanta November 22 2005 grand jury proceeding and in many of government motions litigation, Ms Lieber states "after Jones arrest and detention a confidential source unrelated to this investigation reported that it was rumored that the guys

From "levels" thought they had figure out that a particular persons, was cooperating and that they were persons was cooperating and that they were trying to find some one to kill the suspected cooperation's.

During petitioner modification of condition of detention (pages 7-8) the government bogus theory was: on the basis of information from confidential sources subsequently supported by intercepted telephone calls made by Jones and mail intended for Jones, the federal prosecutors, in Jones criminal case concluded that he was attempting to continue to operate his illegal drug operation from jail, and that he may have been attempting to identify and locate persons cooperating with government officials in his prosecutions, one of whom was housed in the same detention facility with Jones. Based on a concern that Jones may been attempting to tamper with in harm material witnesses, the prosecutor made a request to the jail authorities that Jones be restricted in his ability to contact and communicate with individuals other than counsel (see generally, id.) The representation in the public filing in the criminal matters is consistent with memoranda from November and December 2005

Written by the prosecutors involved. This action and conduct by AUSA Lieber violated a taint team procedure, spied in petitioner defense and a violation of attorney client privilege communication, a clear 6th amendment violation.[10]

To determine the existence of an attorney-client or work product privilege, court focuses on whether the client who communicates the information or the

---

[10] Violation of attorney client privilege-federal courts recognize the attorney-client and work product privileges as doctrine that serve to protect confidential communication between attorney and their clients as well as the mental impression an illegal strategies developed by attorney in anticipation of litigation. See Fisher v. United States, 449 U.S. 383, 589. (1981) noting that the attorney client privilege covers wide range of communication with a purpose of encouraging client to make full disclosure to the attorney.

attorney who creates the work product has a justifiable expectation, **"That the information will remained secret".** [11]

Also, Mr. Balarezo and officer of the courts wrote: upon information and belief, the items seized from Jones cell were not kept by a "taint team" rather; they were kept by the very prosecutors and law enforcement officers that are part of this case. Counsel concludes this by the facts that AUSA Lieber faxed to counsel copies of the seized documents. [12]

Where AUSA Rachel Lieber and her federal investigators illegally listen to petitioner and Ms Beverly Johnson DC jail conversation with out any legal court authority clearly shows the government spied on petitioner defense. [13]

Also, the government spied on petitioner defense when they seize and read Ms. Beverly Johnson letter. [14]

The phone conversation with Ms. Beverly Johnson and the letter from Ms. Johnson, was part of building my defense, as Mr. Balarezo, petitioner counsel has

---

[11] Mr. Balarezo an officer of the court writes: at the beginning of this case, counsel asked Jones to make a list of all the individuals who may have information regarding this case (Possible witnesses) and all the individuals who may be in a position to testify against him( cooperator). Jones did so, but before he could provide the list to counsel, the government searches his cell and seized the list.

[12] On November 23, 2005, F.B.I. special agent Jimmy F. Pope Jr., F.B.I. special agent Stephen R. Naugle, and F.B.I. special agent John C. Bevington executed a search warrant of petitioner D.C. Jail cell and seize attorney client communication documents and spied on petitioner defenses. Agent Stephen R. Naugle, was the special agent who was the seizing agent who search petitioner Moore St. and F.B.I. agent John Bevington testified at petitioner trial and monitor petitioner wiretap conversation both were AUSA Rachel Lieber federal investigator which violated taint procedures.

[13] In the government supplement filing concerning condition of confinement, outline of evidence, jail call section. The government writes: Over the course of his incarceration at the District Of Columbia Jail, Jones has made numerous telephone calls, which were recorded by the jail. Among those calls were several to **"Beverly Johnson"** who has been identified both in calls intercepted on the wiretap and in calls intercepted from the jail. In one call at 10:10 P.M. on November 3, 2005, Jones asked Johnson to try and locate a co-conspirator. Johnson indicated she know someone in the warden's office who can help.

[14] (Johnson Letter) when Jones jail cell was searched on November 23, 2005, a letter from Johnson to Jones was located. The last paragraph provides the location in jail for an unindicted coconspirator. In the same paragraph Johnson report that another unindicted co-conspirator is "on the street last they know" Johnson also states that this second co-conspirator has reportedly been snitching.

12

instructed petitioner to think of, and **try to find any petitioner defense witnesses,** and find out if there are people who **are potential cooperators and government** witnesses.

A confidential source unrelated **to this investigation reported that it was** rumored that "the guys from level" **though they had figured out that a particular** person was cooperating **and that they were trying to find someone to kill the** suspected cooperator.

petitioner will expose this government **bogus rumored, hearsay theory and** fabricated story.

(Exhibit 11) Is a F.D. - 302(debriefing) **from November 30, 2005, protect identity.** (The governments use this debriefing **to support the bogus theory above).**

in this debriefing, special agent **Timothy J. Ervin, writes: Frank Rawlings** was arrested in mid- November of **2005, however, protect identity spoke to** Rawling after he was released **from prison, while he was in the D.C. Jail, Rawlings** spoke with several of the incarcerated **conspirators in the Antoine Jones narcotic** investigation conducted by the F.B.I.. **Those persons told Rawling that they had** obtained paperwork on their case made **them believe that Kirk Carter had also been** charged in the same conspiracy. They **believed that Carter was incarcerated on that** charge for only one day or two. Rawling **is doing everything he can to spread the** word about Carter and hope that someone **will kill.**[15]

AUSA Rachel Lieber knew **for a fact that this November 30, 2005,** debriefing by special agents Ervin on **protect identity was more than a rumor and**

---

[15] I Antoine Jones, swear under the penalty of perjury (28 U.S.C.§ 1746), petitioner do not know a Frank Rawling, and never seen or spoke to a Frank Rawling, in D.C. Jail or in the streets.

hearsay. Ms. Lieber knew the debriefing **was false and a fabrication story because** Ms. Lieber knew that Kirk Carter **didn't get arrested and charge for only a day or** two, because the fact is that Kirk Carter **didn't get arrested and incarcerated until** almost three(3) months later.

(Exhibit 12) is a sworn declaration **from Kirk Carter going into details that** petitioner and Mr. Frank Rawling is **his friend, and he didn't get arrested until** three (3) months later, and he believe **the confidential source information was** bogus in case.[16]

<div align="center">Conclusion</div>

Petitioner will conclude by referring **the court to status conference- Friday** March 17, 2006, 9:50 P.M., page 42 **Lines 16-25, page 43 Lines 1-20, and page 44** Lines 11-24. (Exhibit 13)

Mr. Balarezo: your honor, my **understanding at least from the governments** response to the motion is that the **issues was not communication between Mr.** Jones and others in the jail. It was **communication with Mr. Jones and people out** side. All I see here is that the confidential **source reported a rumor about the guys** from L.A. That is just totally insufficient.

The court: I'll put them to their **proof if they can't come up with something** different. They have letters and conversation by phone.[17]  But I want to hear it. I'm just not satisfied with them getting up **here and saying that in some way he sent out** a message. That's not satisfactory.

---

[16] There's no where in the November 30, 2005, debriefing that's mention Rawling knew petitioner or spoke with petitioner and the debriefing detail Rawling (not Jones) was doing everything he can to spread the word about Carter in the hope that someone will kill Carter.

[17] Interviewing and reviewing Beverly Johnson letter show the government spied on petitioner defense because petitioner attorney requested him to prepare a list containing names and information of potential cooperators and government witnesses who might testify against him, so he could use it in trial preparation.

<div align="center">14</div>

Mr. Balarezo: I can tell the court the part of the allegations that the government is making regarding his communication with other individuals and information that he was seeking, he **was doing it at my request.**

The court: I understand that. I'm not satisfied with either sided making little representation here. It is not satisfactory, I am also not willing to just accept notion that he's lockdown 23 hours a day until this case is finished. **I didn't order that, and I don't know what justified it.**[18] Page 44, judge Huvelle concluded by saying if want to keep him under this condition, **I want you to come forth with the proof** some of it may be ex parte, but he is **entitle to have a real hearing on this.** But if you want it instead of people just say things. If you continue to ask for these particular conditions, you better have **your live witnesses and evidence.**

It been almost six (6) years since AUSA Rachel Lieber and the government has been generating these bogus-false **rumors and fabricated story,** just like hon able judge Huvelle mention petitioner entitle to have a real hearing on this so the government could present live witnesses and evidence.

### There was no probable cause **for the November 22 2005 search warrant.**

The search warrant was based on the prosecution representation that a search of Jones DC jail cell would yield evidence of obstruction of justices and continues criminal activities. This representation, in turn, was base on illegally listening to petitioner D.C. Jail innocent conversation and adopting a bogus false (302-debriefing) riddle with rumors and hearsay, no concrete facts or evidence.

---

[18] On April 24, 2006, honorable judge Huvelle gave an order to get petitioner out of solitary confinement during petitioner modification of detention even after the ordered, D.C. Jail would not let petitioner out of solitary confinement. On May 5, 2006, honorable judge Huvelle sent a second court order stating pursuant to the court's order of April 24, 2006, April 24 order it is here by ordered that defendant Antoine Jones is to be placed fourth with the general population at D.C. Jail.

15

The affidavit was complete with **misstatements, false and deceiving** representation of the DC Jail **conversation and reckless disregards to the truth.** There was no probable cause and since **the warrant was illegal as a result the** search of petitioner cell on November 23, 2005, **was without a doubt illegal.**

*The government F.B.I. agents* **who illegal invaded petition cell, violated** *petition six amendment and petitioner* **attorney client privilege.**[19]

Petitioner never had an evidentiary hearing on this issue thus **the records** never been completes, which made it **much easier for AUSA Rachel Lieber to** commit fraud on the court and deceived **the courts.**

Petitioner is humble requesting **the court of appeals to allow petitioner to** argue his merits and expose the defendant's fraud on the court, concealing their fourth amendment violation in this complaint.

Respectfully Submitted

Antoine Jones

Antoine Jones     DATE: 11-14-2011

U.S.P. LEE
P.O. BOX 305
JONESVILLE VA. 24263

---

[19]Which was done at the behest of the prosecutors in this case, an was undertaken to seize criminal evidence, and to gain tactical advantage on petitioner defense, and this **conduct was not to further institutional security concerns but** to, add more charges on the petitioner, by way of superseding indictment.



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Statement

| | |
|---|---|
| OPI: | PROG |
| Number: | 4070.1B |
| Date: | April 30, 2007 |
| Supersedes: | 4070.1A (4/8/94) |
| Subject: | Inmate Telephone Access |

1. **PURPOSE AND SCOPE.** To establish guidelines governing inmate telephone access.

2. **PCLICY.** It is the policy of the DC Department of Corrections (DOC) to ensure that all inmates housed at the Central Detention Facility (CDF) have reasonable and equitable access to telephones for authorized purposes.

3. **PROGRAM OBJECTIVES.** The expected results of this directive are:

   a. Inmates shall be afforded the opportunity to maintain family and community ties consistent with safety and security requirements of the CDF and the community.

   b. Inmates who are not indigent shall be responsible for the expense of telephone use.

   c. Inmate telephone use shall be monitored in order to preserve the safety, security and orderly operation of the CDF and to protect the general public.

4. **APPLICABILITY.** This policy shall apply to DOC inmates, employees, contractors, volunteers, interns and any others who provide services and conduct business within the DOC.

5. **NOTICE OF NON-DISCRIMINATION**

   a. In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code §2.1401.01 et seq., (Act) the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, or place of residence or business. Sexual harassment is a form of sex discrimination that is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.

(Exhibit #3)

    7)    Name and signature of the staff member placing the call.

e.    If a staff member other than the inmate's Case Manager places the call, he/she must forward a copy of the log entry to the Case Manager to be placed in the inmate's case file.

f.    Legal calls shall be made from a private area where there is limited access for others to overhear the conversation.

## 12. TELECOMMUNICATION DEVICE FOR THE DEAF (TDD)

a.    TDDs shall be provided for inmates who are deaf or hard of hearing in a manner that ensures effective access to telephone services.

b.    Telecommunications Typewriters (TTY) shall be provided for inmates to communicate with family members or friends who are deaf or hard of hearing.

c.    ITS telephones equipped with volume control mechanisms shall be dispersed among the ITS telephones throughout CDF. Appropriate signage shall be installed to identify each volume control telephone.

*Here*

## 13. MONITORING AND RECORDING INMATE TELEPHONES

a.    The audio and call data for all calls made from ITS telephones shall be recorded.

b.    Calls made from the ITS telephones may be monitored live.

c.    Call data from the ITS may be analyzed.

d.    Recorded ITS telephone calls may be reviewed.

e.    <u>Call data records and recordings of inmate telephone calls are considered sensitive and shall not be released without a subpoena or other appropriate legal order.</u>

*Here*

## 14. PROCUREMENT OF INMATE TELEPHONE SERVICES

a.    Contracts for inmate telephone service must comply with all federal and District of Columbia laws and regulations.

b.    Requests for proposals shall require vendors to provide rates that are similar to those charged in the community and to justify any rates or surcharges higher than ordinary commercial rates. Rates should be based on the broadest possible range of calling options.

Devon Brown
Director

| | | Call Date/Time | N |
|---|---|---|---|
| <A HREF="508233.WAV">Play Recording</A> | <A HREF="508233.HTML">View Details</A> | 11/07/2005 19:18:49 | 30 |
| <A HREF="509170.WAV">Play Recording</A> | <A HREF="509170.HTML">View Details</A> | 11/08/2005 11:25:11 | 20 |
| <A HREF="509271.WAV">Play Recording</A> | <A HREF="509271.HTML">View Details</A> | 11/08/2005 12:11:29 | 30 |
| <A HREF="509328.WAV">Play Recording</A> | <A HREF="509328.HTML">View Details</A> | 11/08/2005 12:36:37 | 30 |
| <A HREF="509486.WAV">Play Recording</A> | <A HREF="509486.HTML">View Details</A> | 11/08/2005 13:36:14 | 20 |
| <A HREF="509532.WAV">Play Recording</A> | <A HREF="509532.HTML">View Details</A> | 11/08/2005 13:52:32 | 20 |
| <A HREF="508386.WAV">Play Recording</A> | <A HREF="508386.HTML">View Details</A> | 11/07/2005 21:06:45 | 20 |
| <A HREF="514691.WAV">Play Recording</A> | <A HREF="514691.HTML">View Details</A> | 11/11/2005 09:42:40 | 30 |
| <A HREF="514725.WAV">Play Recording</A> | <A HREF="514725.HTML">View Details</A> | 11/11/2005 09:58:42 | 30 |
| <A HREF="513453.WAV">Play Recording</A> | <A HREF="513453.HTML">View Details</A> | 11/10/2005 17:46:40 | 20 |
| <A HREF="513520.WAV">Play Recording</A> | <A HREF="513520.HTML">View Details</A> | 11/10/2005 18:05:01 | 20 |

| <A HREF="515282.WAV">Play Recording</A> | <A HREF="515282.HTML">View Details</A> | 11/11/2005 13:07:14 | 24( |
| <A HREF="515302.WAV">Play Recording</A> | <A HREF="515302.HTML">View Details</A> | 11/11/2005 13:10:36 | 24( |
| <A HREF="513806.WAV">Play Recording</A> | <A HREF="513806.HTML">View Details</A> | 11/10/2005 19:28:24 | 30: |
| <A HREF="514052.WAV">Play Recording</A> | <A HREF="514052.HTML">View Details</A> | 11/10/2005 21:14:15 | 30: |
| <A HREF="514151.WAV">Play Recording</A> | <A HREF="514151.HTML">View Details</A> | 11/10/2005 21:30:57 | 30: |
| <A HREF="514249.WAV">Play Recording</A> | <A HREF="514249.HTML">View Details</A> | 11/10/2005 21:47:23 | 30: |
| <A HREF="518480.WAV">Play Recording</A> | <A HREF="518480.HTML">View Details</A> | 11/12/2005 18:26:33 | 30: |
| <A HREF="518496.WAV">Play Recording</A> | <A HREF="518496.HTML">View Details</A> | 11/12/2005 18:43:08 | 30: |
| <A HREF="518576.WAV">Play Recording</A> | <A HREF="518576.HTML">View Details</A> | 11/12/2005 18:55:59 | 30: |
| <A HREF="518630.WAV">Play Recording</A> | <A HREF="518630.HTML">View Details</A> | 11/12/2005 19:12:22 | 30: |
| <A HREF="518695.WAV">Play Recording</A> | <A HREF="518695.HTML">View Details</A> | 11/12/2005 19:28:19 | 30: |
| <A HREF="518831.WAV">Play | <A HREF="518831.HTML">View | 11/12/2005 | 30: |

| | | | |
|---|---|---|---|
| Recording</A> | Details</A> | 20:59:11 | |
| <A HREF="518921.WAV">Play Recording</A> | <A HREF="518921.HTML">View Details</A> | 11/12/2005 21:16:43 | 24( |
| <A HREF="519016.WAV">Play Recording</A> | <A HREF="519016.HTML">View Details</A> | 11/12/2005 21:33:46 | 30: |
| <A HREF="519112.WAV">Play Recording</A> | <A HREF="519112.HTML">View Details</A> | 11/12/2005 21:50:34 | 30: |
| <A HREF="519431.WAV">Play Recording</A> | <A HREF="519431.HTML">View Details</A> | 11/13/2005 09:13:55 | 30: |
| <A HREF="519455.WAV">Play Recording</A> | <A HREF="519455.HTML">View Details</A> | 11/13/2005 09:36:27 | 30: |
| <A HREF="519499.WAV">Play Recording</A> | <A HREF="519499.HTML">View Details</A> | 11/13/2005 10:13:14 | 24( |
| <A HREF="520270.WAV">Play Recording</A> | <A HREF="520270.HTML">View Details</A> | 11/13/2005 14:09:27 | 30: |
| <A HREF="522322.WAV">Play Recording</A> | <A HREF="522322.HTML">View Details</A> | 11/14/2005 16:54:41 | 30: |
| <A HREF="522417.WAV">Play Recording</A> | <A HREF="522417.HTML">View Details</A> | 11/14/2005 17:44:54 | 30: |
| <A HREF="523524.WAV">Play Recording</A> | <A HREF="523524.HTML">View Details</A> | 11/15/2005 09:32:29 | 30: |
| <A HREF="523553.WAV">Play Recording</A> | <A HREF="523553.HTML">View Details</A> | 11/15/2005 09:55:49 | 30: |
| <A | <A | | |

| | | | |
|---|---|---|---|
| HREF="522978.WAV">Play Recording</A> | HREF="522978.HTML">View Details</A> | 11/14/2005 21:06:22 | 20 |
| <A HREF="523063.WAV">Play Recording</A> | <A HREF="523063.HTML">View Details</A> | 11/14/2005 21:25:24 | 30 |
| <A HREF="523147.WAV">Play Recording</A> | <A HREF="523147.HTML">View Details</A> | 11/14/2005 21:41:46 | 30 |
| <A HREF="524011.WAV">Play Recording</A> | <A HREF="524011.HTML">View Details</A> | 11/15/2005 13:33:18 | 30 |
| <A HREF="524051.WAV">Play Recording</A> | <A HREF="524051.HTML">View Details</A> | 11/15/2005 13:49:37 | 30 |
| <A HREF="523223.WAV">Play Recording</A> | <A HREF="523223.HTML">View Details</A> | 11/14/2005 21:59:05 | 30 |
| <A HREF="527663.WAV">Play Recording</A> | <A HREF="527663.HTML">View Details</A> | 11/17/2005 11:21:38 | 30 |
| <A HREF="527746.WAV">Play Recording</A> | <A HREF="527746.HTML">View Details</A> | 11/17/2005 11:49:49 | 30 |
| <A HREF="526979.WAV">Play Recording</A> | <A HREF="526979.HTML">View Details</A> | 11/16/2005 21:40:20 | 30 |
| <A HREF="527076.WAV">Play Recording</A> | <A HREF="527076.HTML">View Details</A> | 11/16/2005 21:56:26 | 30 |
| <A HREF="527185.WAV">Play Recording</A> | <A HREF="527185.HTML">View Details</A> | 11/16/2005 22:13:53 | 30 |
| <A HREF="527277.WAV">Play Recording</A> | <A HREF="527277.HTML">View Details</A> | 11/16/2005 22:29:48 | 30 |

**A149**

| | | | |
|---|---|---|---|
| `<A HREF="527446.WAV">Play Recording</A>` | `<A HREF="527446.HTML">View Details</A>` | 11/17/2005 09:39:26 | 30: |
| `<A HREF="531065.WAV">Play Recording</A>` | `<A HREF="531065.HTML">View Details</A>` | 11/19/2005 09:17:53 | 30: |
| `<A HREF="531110.WAV">Play Recording</A>` | `<A HREF="531110.HTML">View Details</A>` | 11/19/2005 09:34:41 | 30: |
| `<A HREF="531168.WAV">Play Recording</A>` | `<A HREF="531168.HTML">View Details</A>` | 11/19/2005 09:51:02 | 30: |
| `<A HREF="531258.WAV">Play Recording</A>` | `<A HREF="531258.HTML">View Details</A>` | 11/19/2005 10:16:13 | 30: |
| `<A HREF="531314.WAV">Play Recording</A>` | `<A HREF="531314.HTML">View Details</A>` | 11/19/2005 10:32:17 | 30: |
| `<A HREF="531367.WAV">Play Recording</A>` | `<A HREF="531367.HTML">View Details</A>` | 11/19/2005 10:48:05 | 30: |
| `<A HREF="530852.WAV">Play Recording</A>` | `<A HREF="530852.HTML">View Details</A>` | 11/18/2005 18:54:44 | 30: |
| `<A HREF="535670.WAV">Play Recording</A>` | `<A HREF="535670.HTML">View Details</A>` | 11/20/2005 22:00:20 | 30: |
| `<A HREF="531543.WAV">Play Recording</A>` | `<A HREF="531543.HTML">View Details</A>` | 11/19/2005 11:55:45 | 30: |
| `<A HREF="534762.WAV">Play Recording</A>` | `<A HREF="534762.HTML">View Details</A>` | 11/20/2005 17:18:18 | 30: |
| `<A HREF="534842.WAV">Play` | `<A HREF="534842.HTML">View` | 11/20/2005 | 30: |

**A150**

cop y

| Recording</A> | Details</A> | 17:35:27 | |
|---|---|---|---|
| <A HREF="534928.WAV">Play Recording</A> | <A HREF="534928.HTML">View Details</A> | 11/20/2005 17:51:47 | 30: |
| <A HREF="535025.WAV">Play Recording</A> | <A HREF="535025.HTML">View Details</A> | 11/20/2005 18:11:57 | 30: |
| <A HREF="535486.WAV">Play Recording</A> | <A HREF="535486.HTML">View Details</A> | 11/20/2005 21:27:08 | 30: |
| <A HREF="535579.WAV">Play Recording</A> | <A HREF="535579.HTML">View Details</A> | 11/20/2005 21:43:40 | 30: |

**A151**

Exhibit # 3

# ORIGINAL

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                              :
UNITED STATES OF AMERICA      :
                             .:
VS.                           :
                              :
LAWRENCE MAYNARD              :
                              :
- - - - - - - - - - - - - - -x

Grand Jury No. 04-1
3rd & Constitution, N.W.
Washington, D.C.  20001

November 22, 2005

The testimony of STEPHANIE YANTA was taken in the presence of a full quorum of the Grand Jury, commencing at 9:55 a.m., before:


RACHEL LIEBER
Assistant United States Attorney

JOHN V. GEISE
Assistant United States Attorney

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1    you also intercept from time to time on the course of wire tap

2    legitimate business calls between Lawrence Maynard and Antoine

3    Jones --

4         A.    Yes.

5         Q.    -- about the nightclub itself?

6         A.    Absolutely.

7         Q.    Paying the rent?

8         A.    Yes.

9         Q.    Improvements to the club, that sort of thing?

10        A.    Yes.

11        Q.    Okay.  Now, since Mr. Jones was arrested, were you

12    actually present in court for some of the court appearances

13    that sort of flowed from the initial arrest of Mr. Jones and

14    this first group of individuals who were indicted?

15        A.    Yes, I was.

16        Q.    And do you -- personally, do you know who Lawrence

17    Maynard is by sight?

18        A.    Yes.

19        Q.    Okay.  Did you see Mr. Maynard in court?

20        A.    Yes, I did.

21        Q.    Okay.  How often did you see Mr. Maynard in court?

22        A.    Whenever Mr. Jones had an appearance, Mr. Maynard

23    was there.

24        Q.    Okay.  And finally, I want to direct your attention

25    to some recent telephone contact from the D.C. Jail.  Are you

1   aware that Antoine Jones is currently housed at the D.C. Jail?

2        A.   Yes, I am.

3        Q.   Okay.  And are you aware that we have received

4   recordings of telephone conversations by Mr. Jones at the D.C.

5   Jail?

6        A.   Yes.

7        Q.   Okay.  Has Mr. Jones -- and I want to confine --

8   well, let me say this.  Have we gotten in another shipment of

9   phone calls?

10       A.   Yes.

11       Q.   Okay.  Did we just get them very late last night?

12       A.   Yes, we did.

13       Q.   Okay.  So I want to direct your attention just to

14   the phone calls the first week of November, the first set of

15   phone calls that we have.  Are you aware of phone calls that

16   Mr. Jones made to a lady friend of his, giving her

17   instructions with respect to Lawrence Maynard?

18       A.   Yes.

19       Q.   Okay.  Tell the Grand Jury about that.

20       A.   Mr. Jones was talking to a female friend of his, and

21   during that conversation, he told this woman, "If you receive

22   any letters at your house that aren't addressed to you, don't

23   open them.  Give them to Lawrence.  He'll know what to do."

24       Q.   Okay.  Give me a second.  Okay.

25            BY MR. GEISE:

1       A.    That's correct.

2       Q.    And sometimes they'll also do it by face to face

3   meetings?

4       A.    Yes.

5       Q.    I don't have any other questions.

6            MS. LIEBER.    Do you all have questions for Special

7   Agent Yanta?

8            GRAND JUROR.    I just have one.  Is it a common

9   practice to monitor phone calls from when they're housed in

10  jail?  Is that legal?

11           WITNESS.    It is legal.  We actually have to

12  subpoena them, but all telephone calls in and out of the jail

13  are recorded.

14           MS. LIEBER.    And let me just stop you there

15  because --

16           MR. GEISE.    When we, actually, when the agent's

17  gone, we'll gladly sort of lay out the legal stuff for you.

18  We can't testify, but we can tell you the legal background if

19  you're interested.

20           BY MS. LIEBER:

21      Q.    And just for the Grand Jury's, sort of, edification,

22  was there a particular reason why we, last week, got to obtain

23  some jail telephone calls from Mr. Jones?

24      A.    There was.  We had source information that Mr. Jones

25  and his codefendant were actually, as we sort of termed as

1  circling the wagons, they were trying to figure out who may

2  have snitched on them, and they were actually plotting to have

3  someone killed.

4      Q.    Now, this is based on -- we have not --

5      A.    Based on source information.  This is all based on

6  source information, stuff that, you know, an individual who is

7  reporting to law enforcement was hearing on the street.  So,

8  you know, again, we don't know the, you know, the entirety of

9  the situation.  However, it was enough to, you know, flag, you

10 know, not only law enforcement, but also, you know, the

11 individual that may have been targeted, and, you know, affect

12 some other investigative techniques.

13     Q.    Is that -- just for the Grand Jury -- is that what

14 caused investigators to move quickly to try to obtain --

15     A.    Yes.

16     Q.    -- those jail calls?

17     A.    Yes.

18         MS. LIEBER.   Any others?  Okay.  Thanks.

19         GRAND JUROR.    Thank you for coming.

20         WITNESS.    Thank you.

21         (Whereupon, at 10:12 a.m., the witness was excused

22 and subsequently recalled at 10:20 a.m.)

23         GRAND JUROR.   Yeah, just one quick clarification,

24 please.  At the time that the van was stopped, what was the

25 provocation for the van being stopped?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ) | |
| THE UNITED STATES OF AMERICA FOR AN ) | <u>FILED UNDER SEAL</u> |
| ORDER AUTHORIZING THE ISSUANCE OF A ) | |
| SEARCH WARRANT FOR FOR THE ENTIRE ) | |
| JAIL CELL AND PERSONAL PROPERTY OF ) | |
| ANTOINE JONES, D.C. JAIL, 1901 D STREET ) | |
| SOUTHEAST, WASHINGTON, D.C. ) | |

## AFFIDAVIT

I, Norma Horne, am a police officer of the District of Columbia Metropolitan Police

Department (MPD), having been duly sworn, state:

### I. INTRODUCTION

I am an investigative and law enforcement officer of the United States and District of

Columbia who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in the Comprehensive Drug Abuse Prevention and Controlled Substances Act of

1970, Title 21 of the United States Code (USC), as amended and the Uniform Controlled

Substances Act, Title 48 of the District of Columbia Code as well as Title 18 offenses.

I am an officer of the District of Columbia Metropolitan Police Department and have

been so employed for over 14 years. I have received narcotics specialization training from the

Metropolitan Police Department Training Division, the United States Attorneys Office and gang

training from the Mid Atlantic Great Lakes Organized Crime Law Enforcement Network. I have

attended the Expert Witness class offered by the Major Narcotics Branch, MPD. I have also

received firearms trafficking and identifying an armed subject training from the Bureau of

Alcohol Tobacco and Firearms. I have been personally involved in numerous narcotics and

weapons investigations throughout the District of Columbia, with concentrated efforts in the

Northeast area of the city. I have worked in an undercover capacity during which I purchased

things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager.

Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to the target telephone authorized by United States District Court Judge Paul L. Friedman on September 2, 2005, and extended on September 30, 2005, (g) debriefings of confidential informants; and review of intercepted telephone calls placed by ANTOINE JONES from the D.C. Jail.

It is a common practice of drug traffickers who are incarcerated to reach out to associates who remain in the community to continue their illegal drug trafficking activities while incarcerated, including attempts to influence witnesses and arrange for the concealing or destruction of evidence. Such outreach takes many forms, including telephone calls from the jail, and letters containing instructions regarding the manner in which to continue the business. It is also common practice for individuals who receive such letters to maintain them for a period of time, and to refer to the instructions contained therein.

Your affiant also knows from prior training and experience that inmates frequently maintain letters, notebooks, phone books, family photographs and other notations in their cell and among their personal property. Examination of this material can provide investigators with the identity of persons close to the inmate, including co-defendants and persons willing to commit criminal acts for the defendant. Inmates will also utilize the inner-jail mail system to correspond with other family members and friends, and in this correspondence, as well as in normal correspondence, will discuss or allude to criminal activity, often using slang or code.

Additionally, the affiant knows that if an inmate write on a pad, and then mails or destroys what he has written; chemical analysis of that pad can often reveal what was written.

Finally, your affiant also knows from training and experience that the D.C. Jail will frequently move inmates and/or their possession at a moments notice, both for administrative and security reasons. The location of any inmate and/or his property can be determined at any specific time through the Central Records Department of the D.C. Jail.

4
**A50**

*All Bull* ⟨scribble⟩

## C. October 24, 2005 Take Down

On this date, a number of sealed search warrants were executed at various locations throughout the greater Washington, D.C. area.  A total of nine individuals were arrested, but **MAYNARD** was not among them.  Of particular significance, recovered at the "stash location" at 9508 Potomac Drive in Ft. Washington, Maryland, Investigators recovered ninety-seven (97) kilograms of cocaine powder, three (3) kilograms of crack cocaine and $834,520.00 in US currency.  Three Hispanic males were arrested at this location, two of whom were Mexican Nationals, and one of whom was identified seated in the passenger seat of **JONES's** Jeep Grand Cherokee in a photograph that was taken by a surveillance team.  At other locations searched that day, smaller quantities of cocaine were found, for example, half-kilogram quantities, along with smaller quantities of cash, for example, $12,000.00, along with firearms, and narcotics packaging materials at several houses.  Further, a gun was recovered from the office of **JONES's** nightclub **LEVELS**, and in excess of $69,000.00, in cash was *NEVER MENTION SOURCE FOR INFORMATION* ep Grand Cherokee.

## D. Intercepted Jail Telephone Calls

Over the course of his incarceration at the District of Columbia Jail, **JONES** has made numerous telephone calls, which were recorded by the Jail.  Among those calls were several to **DEBORAH O'NEAL**, who has been identified both in calls intercepted on the wiretap and in calls intercepted from the Jail, as a romantic interest of **JONES**.  In one such telephone call, on November 3, 2005, at approximately 9:16 p.m., **JONES** told **O'NEAL** that he had sent her a few letters from the Jail.  In particular, he mentioned that when she gets letters with another name on them, that she should hold onto the letters and give them to "Lawrence" because "Lawrence"

*#1*

*whats illegal about that? Dont have lawrence address.*

*[handwritten at top:] my JAIL CALLS? These calls never mention obstruction of Justice, or Tampering with witness,*

knows what to do with them. Later in this approximately 15 minute telephone call, JONES

reminds O'NEAL that when she gets letters without her name on them, that she should just hold

*[handwritten: #2]* them. In a later call to O'NEAL, on November 6, 2005, at approximately 11:57 a.m., JONES

and O'NEAL discuss "Lawrence" at some length. JONES told O'NEAL to tell "Lawrence" to

*[handwritten: Talking about club business]* write to him and let him know what was going on, because he doesn't want to be "in the blind."

Investigators believe that since he has been incarcerated, JONES has written letters to other

*[handwritten: who-prejudice]* members of his illegal narcotics-trafficking operation, but has sent them to O'NEAL's house, *[handwritten: Lies Brian]*

*[handwritten: Prejudice-statement]* who in turn will give them to MAYNARD, in an effort to conceal his communications with

those individuals. Specifically, investigators believe that JONES has sent letters to MAYNARD

*[handwritten: False statement. never sent letter through Deb to give to Lawrence]* via O'NEAL, which speak of the details of ongoing narcotics trafficking, including the possible

concealment of evidence, and the continuation of the business, and that MAYNARD has kept

these letters in his possession, as is common in the illegal narcotics trade.

*[handwritten: #3]* Further, in numerous conversations with his wife, Deniece Jones, ANTOINE JONES is

heard urging her to get into contact with MAYNARD, to tell him that JONES needs to speak

*[handwritten: club business]* with him. On a few occasions, JONES asks his wife to call MAYNARD on her cellular

*[handwritten: #4]* telephone, while JONES's call from the Jail is underway on the landline. JONES repeatedly *[handwritten: Talk about club business]*

tells his wife to tell MAYNARD to come out to the Jail to visit him. Based on these calls, and

on MAYNARD's identified role in JONES's narcotics-trafficking operation, investigators

believe that MAYNARD has evidence pertaining to narcotics-trafficking in his possession, to

include letters from ANTOINE JONES.

*[handwritten at bottom:]*
*Lock Lawrence up November 23, 2005*
*Same day the prosecutor got an indictment*
*Same day they got a search warrant for my cell*
*(Didnt mention Beverly at all) on Pep-Boys was*

12

A58

*[handwritten bottom left: COPY]*

## PROBABLE CAUSE FOR INDIVIDUAL LOCATION

1. **Jail Cell and personal property of ANTOINE JONES** (a black male, Date of Birth: February 25, 1960, SSAN: 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, FBI#: 901461KA2)

ANTOINE JONES is currently an inmate of the D.C. Jail located at 1901 D Street, Southeast, Washington, D.C. The exact location of the cell occupied by and the exact location of any stored personal property will be determined through the D.C. Jail's Records Department at the time of the execution of the search warrant.

### OFFENSES

Attempted obstruction of justice and witness tampering, in violation of 18 U.S.C. § § 1510, 1512, and 1513, and violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) § 841(a)(1); and (b) conspiracy to commit such offenses, in violation of 21 U.S.C. § 846.

### CONCLUSION

Wherefore, based upon the facts and circumstances related above and my experience as a Special Agent of the FBI, I believe that there is probable cause to believe that the following articles are present at the subject premises:

1) Books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances;

2) Letters, notes, and other papers relating to the coverup of past distribution of controlled substances, including letters of instruction to non-incarcerated individuals;

3) Personal books and papers reflecting names, addresses, telephone numbers, and

13

**A59**

other contact or identification data relating to the distribution of controlled

substances; and    *False*

4) Items of personal property that tend to identify the person(s) in residence,

occupancy, control, or ownership of the premises that is the subject of this

warrant, including but not limited to canceled mail, photographs, personal

telephone books, diaries, and identification documents.    *Spying on the Defense*

I swear and subscribe to the information contained in the Affidavit:

NORMA HORNE
Detective
Metropolitan Police Department

*Don't see return to the Judge*

*All the Rest of the Affidavit is Double talk, Bull crap and the same as the old Affidavit. From Pb #1 to this page it's misstatements, False statement, Deceiving and Misleading. And once Again just like a rubber stamp the Judge stamp there name on any thing the Government or PBI say.*

**455 PM**

Sworn to and subscribed before me
this ____ day of _____ 2005 in
the ___ 22 NOV 2005 _____

UNITED STATES MAGISTRATE JUDGE

*I went to the Hole for 5 month in maximum security, Because of this Affidavit "pb #1 to this pb. All Bull crap. "civil suit"*

*In the CONCLUSION, from # 1, 2, 3, 4, it speaks on drugs, distribution; controlled substances And conspiracy. NO mention of obstruction of Justices, witness Tampering, And what suppose to be the main objective "Those Guys from levels is looking for some one to Hunt.*

14

Exhibit #5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                    :

UNITED STATES OF AMERICA    :

    vs.                   :   Criminal No. 05-0417

                     :

LAWRENCE MAYNARD        :

                     :   Washington, D.C.
- - - - - - - - - - - - - x  November 29, 2005

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE ALAN KAY
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Government:    RACHEL CARSON-LEIBER, ESQ.
                        Assistant United States Attorney

For the Defendant:.    EDWARD SUSSMAN, ESQ.
                        Federal Public Defender Service

Proceedings recorded by the Court, transcript produced by Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307, Washington, D.C. 20005, 202-347-5395
M9929/bf

1   | him at that location -- he was, as I said, sort of an
2   | intermediary and a point of contact between Mr. Jones and
3   | sort of the -- you know, that's the pattern, is Mr. Jones
4   | collects money, goes out to the stash house, gets a large
5   | quantity -- kilogram quantities of cocaine, and then goes
6   | and makes his rounds and drops off some of these drugs,
7   | and on occasion the -- you know, it's our belief that when
8   | he says that he's leaving "it" or "that stuff" or "the
9   | bag" or whatever it is, "with Maynard" or, "Go get that
10  | from Maynard," that sort of thing, that's the connection
11  | of Mr. Maynard to the stash location.
12  |         Finally, I would just say, with respect to
13  | detention, since Mr. Jones and that initial wave of
14  | defendants were locked up, the Government has come into
15  | possession of some intercepted telephone calls from the
16  | jail, from the D.C. Jail, by Antoine Jones to, in
17  | particular, one of his girlfriends.
18  |         There are a few telephone calls with her and, to
19  | be quite honest, we have not actually gotten through all
20  | of the jail calls because they're voluminous, but in at
21  | least two telephone conversations Mr. Jones tells this
22  | particular girlfriend that in addition to the letters that
23  | he's sending her that are personal in nature to her, that
24  | in fact he's also in fact sending her letters that if she
25  | gets any letters to her address but without her name on

**A136**

1   initial arrests in the case.  Mr. Maynard was in Court all
2   day, every day, at all those appearances.  It's not like
3   Mr. Maynard has washed his hands of Mr. Jones in any of
4   his organizations.
5          So I think that to downplay that, why in
6   heaven's name would Mr. Jones not just send a letter to
7   Mr. Maynard at his address?  Why would he have to send it
8   through a conduit, a girlfriend -- not even his wife, but
9   his girlfriend?
10          And I will note also, Your Honor, that in other
11   intercepted jail calls Mr. Jones speaks at length with his
12   wife about Mr. Maynard.  And so if in fact he had some
13   information to pass to Mr. Maynard and he just couldn't
14   possibly get it to Mr. Maynard because he couldn't, gosh,
15   remember his address, he certainly could give it to his
16   wife and say, "Just tell Lawrence X, Y or Z," and in fact
17   he didn't.  What he did was he chose to go through a
18   surreptitious route to get information passed --
19   information out to Mr. Maynard, who was his right-hand
20   associate who was still out on the street.  Not actually
21   incarcerated.
22          And to the extent that Mr. Sussman wants to
23   argue that, you know, the Government must not have had
24   enough evidence to charge Mr. Maynard at the time of the
25   initial arrests, Your Honor, I won't get into the

**A142**

On Thursday, January 26, 2006 I went to what I thought was going to be my appearing before the grand jury, but instead, I met with Rachel Lieber, Stephanie Yunta and Steve (don't know his last name...short stocky white male) and another agent (don't know her name...tall black female who came in towards the end of this meeting). We met in one of the witness rooms outside the grand jury hearing room. I got there around 1:05 p.m., for again, what I thought was a 1:30 p.m. appearance before the grand jury with no plans to meet with Ms. Lieber, but after said that she along with the agents wanted to talk to me before going into the grand jury, I agreed.

Stephanie asked me for my personal information (name, address, telephone number and occupation) which she and Ms. Lieber proceeded to write down along with everything else that I said. Ms. Lieber then said that I was there to testify before the grand jury and asked me if I knew what that entailed and my response was "not exactly". She went on to say that I would be asked questions regarding their investigation of Antoine Jones and that I was expected to tell the truth and if not it would result in my perjuring myself and lead to charges being brought against me. After her explanation of the grand jury process the conversation proceeded as follows:

Lieber: We have listened to a lot of phone conversations between you and Antoine and from those conversations it is clear that the two of you are romantically involved, but we are not here to judge you for that and we don't care about that. We want you to know that whatever is said in this room or before the grand jury is secret and will never disclosed to anyone. We will never tell anyone, but if you choose to tell someone that's your business, but we won't.
Lieber: Are you and Antoine romantically involved?
Answer: Yes.
Lieber: Where did you meet him?
Answer: We worked togther.
Lieber: Where?
Answer: P.G. Sports & Learning Complex.
Lieber: Where is that located?
Answer: Landover.
Lieber: How long have you known him?
Answer: Four years.
Lieber: How long after you met him did you become involved?
Answer: About one year.
Lieber: How did you find out about all of this and him being arrested?
Answer: On the news and in the newspaper.
Lieber: Did he tell you to send him all the articles from the paper and the internet because they didn't have the same thing that the paper was saying?
Answer: He did ask me to send him the newpaper articles, but I don't know what you mean when you say that he said they didn't have the same thing that the paper had?
Lieber: What did you send him?
Answer: The article from the paper and two other articles from the internet.
Lieber: Were you supposed to meet him the night before he was arrested?
Answer: No and I don't even know when he was arrested. When was he arrested?
Lieber: On Monday morning, October 25. Didn't you talk to him the night before he was arrested and was supposed to meet him?



Answer: Yes, I did talk with him on Sunday night for a few minutes and he then asked me if I had company and I said yes and he said okay. I will talk to you tomorrow and we hung up. I called him back later and talked to him briefly, but I wasn't supposed to meet him.

Lieber: He went out of town the week-end before he was arrested, where did he go?

Answer: Church.

Lieber: He went out of town to church?

Answer: Yes, he and his family attended church out of town.

Lieber: Nov. 3, which is the first call that Antoine made to you from jail...after you found out that he was alright and you went through the I miss you and things like that, why didn't you ask him what the hell was going on?

Answer: I don't know.

Lieber: I am having a hard time believing that your boyfriend that you love so much and believe is this great guy could be the leader of a drug ring that got caught with almost a million dollars, 100 kilograms of cocaine, guns and go to jail and you not act any different than you did, unless you knew what was going on. Again, since this was your boyfriend, we just couldn't figure out why you didn't respond as shocked, upset, angry or anything like that. This was the largest amount of cocaine seized in D.C. history and in the paper his name was listed first as the leader.

Answer: Again, I don't know. My response was what it was and I can't give an answer as to why it wasn't what you thought it should have been.

Lieber: Well, here is an example, we listened to another one of his calls with a female caller who said that she was shocked as ever and almost fell off her chair when she heard about this and we can't figure out why your response wasn't the same or somewhat similar to hers?

Answer: Again, what do you want me to say...I can't tell you why my response wasn't like that of someone else. I felt that if he wanted to tell me what was going on and why he was in jail, he would. I am not one to pry into other people's business.

Question: You mean that you had no idea that he was a drug dealer and that he was hanging out with all these Mexicans?

Answer: No, I didn't and I still don't. Can I just say something here? I have no knowledge of what it is that you are accusing him of and it looks as if the only way that you are going to believe me is if I say what it is that you want to hear and I won't do that because then I would be lying. I thought that a person was innocent until proven guilty anyway.

Lieber: Yeah, that's true.

Lieber: On another call (Nov. 6) that he made to you from jail, he told you that if any letters came to your house from him with someone else's name on it, you should hold it for Lawrence and he would get them from you.

Answer: That's not true. He never told me to hold anything for Lawrence.

Lieber: But didn't he did tell you that you might get some letters from him with somebody else's name on it and you said okay fine?

Answer: Yes.

Lieber: Did you ever get any letters addressed to someone else?

Answer: No, they were addressed to me with someone else's name on the back.

Lieber: Who's name was on it?

Answer: Bryant

Lieber: What did you do with it?

Answer: I gave it to Bryant.

P 62



Lieber: How did you contact this Bryant?

Answer: I called him?

Lieber: How did you know how to contact him?

Answer: Antoine gave me his phone number.

Lieber: How did he give you his phone number?

Answer: In a letter.

Lieber: What was in the letter with Bryant's name on it and why do you think that he asked you to deliver it?

Answer: I don't know what was in the letter because I didn't open it and I imagine that he asked me to give it to Bryant because he didn't know his address.

Lieber: When did this happen?

Answer: I don't know the date.

Lieber: Where does he live?

Answer: I don't know.

Lieber: Then how did you give it to him?

Answer: I met him on my way home from work one night.

Lieber: Where?

Answer: I had to stop at the drycleaners and he met me there.

Stephanie: What was he driving?

Answer: I don't know.

Stephanie: You mean you didn't see what he was driving?

Answer: I didn't say that I didn't see it, I just don't know what it was....I think it may have been an SUV.

Stephanie: What color was it?

Answer: I don't know, it was dark out and it may have been a dark color.

Ms. Lieber seems to be getting frustrated with me because I am not giving the answers that it appears that she wants and reiterated the consequences of perjury. She again said that she was having a hard time believing what I was saying.

At this time Stephanie pushed in front of me a sheet of paper that she got from Ms. Lieber which had pictures of twelve men on it and asked me if I recognized any of them.

I pointed to Antoine, Lawrence and Adrian. I pointed to someone who I thought might have been John and I said to her "is this John" and she said that they couldn't tell me whether it was or not and I said "it could be...I'm not sure". I did not know any of the other men in the pictures. If I can remember, there were three other black men, four that were some other race and one white.

Steve: Are you referring to John Adams?

Answer: I think that's his name, but I don't really know him like that. I may have seen him a few times at the club and I am not sure that's him.

Lieber: What was the relationship between Antoine, Lawrence, Adrian and John?

Answer: Adrian was co-owner of the club, Lawrence was the manager and John was a bar manager.

Lieber: In another phone call that Antoine made to you from jail, he said that "Mike is in here

crying and his wife is crying". Who is Mike?

Answer: His nephew.

Lieber: No, who is Mike that would be in there crying?

Answer: I think that you misunderstood what he said. I heard him say that "Mike is crying and his wife is crying, but not "Mike is in here crying".

Lieber: Why would he be talking about his nephew?

Answer: I don't know, but his nephew Mike is who he was referring to.

Lieber: What is Mike's last name:

Answer: Jones?

Lieber: So you are saying that you don't know Mike Huggins (sp?)?

Answer: No I don't.

Lieber: In another phone call that he made to you, when he was talking about selling the club to a guy from down near the waterfront, he said that "they tried to time this just right so they could stop the sale of the club?

Answer: I don't recall him saying that.

Lieber: Why did he leave his job at the gym and buy a night club?

Answer: I don't know.

Lieber: Why did he want to sell the club?

Answer: It took up to much of his time.

Lieber: After he sold the club, what was his plans, how was he going to make money?

Answer: I don't know. He did mention that he wanted to get into real estate.

Steve: Who is Derek?

Answer: His nephew.

Steve: What is his last name?

Answer: Jones.

Steve: So you don't know Derek who takes pictures at the club when they had cabarets?

Answer: Oh, okay, I do know him, but not personally. I had seen him at the club on a few occasions.

Steve: In a phone conversation with Antoine, did he tell you to collect some money from Derek?

Answer: No, he didn't.

Steve: Didn't he help you out by giving you some money at times and told you to collect some money from Derek?

Answer: No. Antoine was going to loan me some money, he asked me to call Derek on three way because Derek owed him some money and when Derek finally answered the phone Antoine told him to give me the money that he owed him.

Steve: When and where were you supposed to collect it?

Answer: I wasn't supposed to collect anything and nothing ever came of that phone conversation.

Steve: Did Antoine give you money to help get your car?

Answer: Yes.

Steve: How much did he give you?

Answer: $2,000.

Steve: Did he give you money regularly to help you out with bills?

Answer: No, but there were a few occasions where he loaned me money and I always paid him back.

Steve: When you worked together at the gym, who else worked on the shift with you?

Answer: What do you mean?

Steve: Did any of the other guys work on the shift with the two of you?

Answer: Yes, a shift wasn't just me and Antoine, a shift could be any where from six to ten people depending upon the day or time of day.

Steve: Who were some of the other guys on the shift?

(I didn't get to respond to this question because Ms. Lieber came back in the room and started talking, then after she realized that she had interrupted Steve, she apologized to him and his next question was)

Steve: Didn't your daughter date Adrian?

Answer: No, she never dated him.

Steve: Didn't she date him and know that he was a drug dealer?

Answer: She never dated him and knew nothing about him being a so-called drug dealer.

Lieber: Have you ever seen Antoine with any large sums of money?

Answer: I was with him once when he made a bank deposit of about $5,500 for the club.

Lieber: Was the deposit under $10,000?

Answer: Again, it was about $5,500.

Stephanie: At what bank?

Answer: SunTrust.

Lieber: Did he always carry large sums of money in his pockets?

Answer: I don't know. He sometimes had change for the bar at the club on nights they had events.

Lieber: Was it large bills?

Answer: I don't know.

Lieber: Did he go to the bank everyday?

Answer: I don't know.

Lieber: Did you know that the club was losing money hand over fist and was in big financial trouble?

Answer: No.

Lieber: Did you know that he was trying to sell the club?

Answer: Yes.

Lieber: When was the last big event at the club?

Answer: I don't know, but the last one that I knew of was the football party.

Lieber: Did you run some ads in the paper for the sale of the club?

Answer: Yes.

Lieber: Why did you do it instead of him doing it himself?

Answer: He asked me and I had no problem doing it.

Lieber: When and where was the last time you saw him?

Answer: I visited him the day after Thanksgiving?

Lieber: When was the last time that you talked to him?

Answer: I don't know….just before he couldn't make phone calls any more.

Lieber: How did you know that he couldn't make phone calls any more?

Answer: He told me in a letter.

Lieber: What did he tell you was the reason why he couldn't make calls?

Answer: Because he was in the hole?

Lieber: Did he tell you why he was in the hole?

Answer: No.
Lieber: When was the last time that you received a letter from him?
Answer: Monday or Tuesday.
(I got the feeling that they were surprised that he was getting mail or able to send out mail)

Lieber: Did he know that you had been subpoenaed to appear before the grand jury?
Answer: Yes.
Lieber: How did he find out?
Answer: I told him.
Lieber: How?
Answer: I told him in a letter.
Lieber: Did he tell you to call his lawyer?
Answer: Yes.
Lieber: Did you?
Answer: Yes.
Lieber: What did he tell you?
Answer: What he was charged with and that he could get life in prison.
Lieber: With the charge that we have against him now, he will get life in prison and we will be back in court again in March and we will have some more charges against him.
Lieber: In one of his phone calls to you, what did he mean when he said "I've got to be strong because if I break down, then it will be like a domino effect....what did he mean by that?
Answer: I didn't ask and I don't know.
Lieber: Why did he think that they were going to be released when they went back to court on December 19?
Answer: I don't know.
Lieber: In one of his earlier conversation with you he said that they let Adrian go, but then the Judge changed her mind, what was that about?
Answer: I don't know.
Lieber: Did he have a phone of yours?
Answer: Yes.
Lieber: Why?
Answer: Because I didn't want his phone bill going to his house with my numbers on it.
Lieber: So you gave him a phone so that he could talk to you on.
Answer: Yes.
Lieber: What was that phone number?
Answer: 240-893-2503.
Lieber: Why did he change his phone number?
Answer: I don't know.
Lieber: How did you find out that he had a new number?
Answer: He called me and told me.
Lieber: Had he changed his number before?
Answer: Yes.
Lieber: Just to let you know, you will be receiving a certified letter in the mail letting you know that you were on intercept from two of his phone numbers.

Steve: What kind of car does he drive?
Answer: A Jeep Cherokee and a Toyota Sequoia.
Steve: What color are they?
Answer: Goldish brown....something like that.
Question (I don't know who asked): Does he have a friend that lives in your neighborhood?
Answer: I don't if they are friends or not, but he did know a guy in my neighborhood.
Question: What is his name?
Answer: I think it's Kevin.

It is now about 2:35 and I asked them how much longer is this going to take? Ms. Lieber again leaves the room to see if the grand jury was ready for me. While she was out of the room Stephanie and Steve continued to watch me as if they were looking for some kind of sign or something. I then started to look back at Stephanie and then she asked me " who are you more mad at, him or us? My response was "I am not mad at him, I am not mad at anyone? She also asked me if I was still running? I said sometimes. I then asked her how did she know that I run. Her smirky response was "we heard about the 10k race on intercept". She asked me if I had taken the day off work and I said no and that I really needed to get back to work because I had things that I needed to get out before the end of the day. At this time, the tall back female agent entered the room and she asked me "in another phone conversation that you had with Antoine, what do you think that he meant when he said that his wife was the only one who stood by him when he was in prison? I said, I don't know what he meant and I didn't ask. She said "do you have any relatives that have ever be in prison" and I said "no", but why did you ask me that question? She responded by saying something to the effect that I would know how the system worked (I was puzzled and didn't know what she meant and I didn't ask for clarification).

Ms. Lieber re-entered the room and told me that it was my lucky day and that they weren't going to waste the grand jury's time, or their time or my time, but they had confirmed some things that they wanted to know by talking to me and that they were going to listen to the tapes some more and if they came across anything that I wasn't being truthful about, then they would have to bring perjury charges against me. She also said that if they needed to talk to me again or decided that they wanted to bring me before the grand jury, they would re-subpoena me. I then asked if they would refrain from coming in to my job again, and perhaps send it in the mail. Stephanie then said "no, we have to deliver it personally". I then said "I know that I can't tell you people what to do, but would you bring it to my house". Stephanie then said that "most people don't want them coming to their house". My response to that was "well, I am not most people and I would rather you come to my house instead of my job. Ms. Lieber then said that since they had my phone numbers, they could just call me. I said fine. When I left it was about 2:55 p.m.

I was just thinking about the question that Steve asked me about Antoine giving me money for my car. If it is true that they were only listening to my calls with him from September 2, 2005 to October 25, 2005, then how could they possibly know about something that happened back in February or March because I don't recall that being the subject of any of our conversations during the above stated time period.

The questions are not in any particular order and I tried to think of everything that I could remember that they asked me.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :     **Criminal No.:** 05-386-1(ESH)

             : 

        v.           : 

             : 

ANTOINE JONES             : 

             : 

       Defendant.      : 

## GOVERNMENT'S SUPPLEMENTAL FILING
## CONCERNING CONDITIONS OF CONFINEMENT

The United States, by its counsel, the United States Attorney for the District of Columbia,

supplements its opposition to the defendant's motion for modification of conditions of

confinement as follows:

A hearing on the defendant's motion to modify conditions of confinement is set for

Friday, March 24, 2006. In anticipation of that hearing the United States wishes to provide the

Court and counsel with both a summary of the evidence it intends to present at the hearing or

under seal and a proposal.

## I. OUTLINE OF EVIDENCE

### A. Affidavit Under Seal

An affidavit under seal has been provided to the clerk's office concerning information

derived from or about confidential sources.

### B. Jail Calls

Over the course of his incarceration at the District of Columbia Jail, Jones has made

numerous telephone calls, which were recorded by the Jail. Among those calls were several to

Beverly Johnson, who has been identified both in calls intercepted on the wiretap and in calls

intercepted from the jail, as a romantic interest of Jones. In one call at 10:10 p.m on November 3, 2005 Jones asks Johnson to try and located a co-conspirator. Johnson indicates she know someone in the warden's office who can help. [1]

### C. Johnson's Letter

When Jones' jail cell was searched on November 23, 2005, a letter from Johnson to Jones was located. The last paragraph provides the location in jail for an unindicted co-conspirator. In the same paragraph Johnson reports that another unindicted co-conspirator is "on the street last they know." Johnson also states that this second co-conspirator has reportedly "been snitching". This letter is attached at A.

---

[1] Although not specifically mentioning possible witnesses there were several jail calls to Deborah O'Neal , who has been identified both in calls intercepted on the wiretap and in calls intercepted from the jail, as another romantic interest of Jones. In one such telephone call, on November 3, 2005, at approximately 9:16 p.m., Jones told O'Neal that he had sent her a few letters from the jail. In particular, he mentioned that when she gets letters with another name on them, she should hold onto the letters and give them to "Lawrence" because "Lawrence" knows what to do with them. At this time Lawrence Maynard had not been arrested or indicted. Later in this approximately 15 minute telephone call, Jones reminds O'Neal that when she gets letters without her name on them, she should just hold them. In a later call to O'Neal, on November 6, 2005, at approximately 11:57 a.m., Jones and O'Neal discuss "Lawrence" at some length. Jones told O'Neal to tell "Lawrence" to write to him and let him know what was going on, because he doesn't want to be "in the blind."

In numerous conversations with his wife, Deniece Jones, Jones is heard urging her to get in contact with Maynard to tell him that Jones needs to speak with him. On a few occasions, Jones asks his wife to call Maynard on her cellular telephone, while Jones' call from the jail is underway on the landline. Jones repeatedly tells his wife to tell Maynard to come out to the jail to visit him.

UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

---

No. 08-3034

---

ANTOINE JONES,                                      Appellant,

v.

UNITED STATES OF AMERICA,                          Appellee.

GOVERNMENT'S OPPOSITION TO APPELLANT'S *PRO SE* MOTION FOR RELEASE
PENDING THE FILING OF A PETITION FOR A WRIT OF CERTIORARI AND
MOTION TO EXTEND THE STAY OF THE MANDATE IN THIS CASE

The United States of America, by and through its attorney, the
United States Attorney for the District of Columbia, hereby
opposes appellant Antoine Jones's pro se motion to supplement his
motion for release pending appeal (Document No. 1294199).  This
Court should deny that motion because, inter alia, appellant is not
entitled to release pending appeal.

In addition, the Court should extend the stay of the mandate
in this case until the time for filing a petition for writ of
certiorari in this case expires and no petition is filed or, if a
petition is filed, until the Supreme Court's final disposition of
this case.  Counsel for appellant Jones takes no position on the
government's request to continue the stay of the issuance of the
mandate in this case.  Counsel for appellant Maynard does not
oppose the requested relief.

14

included numerous conversations Jones had with Hunter (R.M. 219),

Johnson (R.M. 237), and Garcia (R.M. 77), and conversations between

Jones and Bermea that coincided with Jones's trips to the Potomac

Drive stash house (R.M. 217-18). The witnesses explained that

Garcia did not have any legitimate business with either Jones or

the Levels nightclub (App. 839), and that the many brief meetings

Jones conducted in locations along Branch Avenue, Maryland, and at

the Levels nightclub, were for the purpose of exchanging cash for

cocaine (R.M. 174, 182, 188-90, 231-32).

In addition, the government made repeated and detailed

proffers in the district court supporting the district court's

determination that appellant was ineligible for pretrial release

(see Document Nos. 52, 57 (including 33-page proffer), and 85).

The government's proffers (see Documents 52 and 57) included much

of the same information that was admitted at appellant's trial. In

addition, the government proffered that based upon witness

information, a review of appellant's telephone conversations from

jail, and a search of his jail cell, the government had "strong

reason to believe that Jones was attempting to identify and locate

potential government witnesses with the intent to intimidate them

or worse" (Document No. 85 at 2)(see also Document No. 57 at 5).

Appellant also argues that "all" of his "co-defendants were

acquitted or have served their time since his conviction" (Supp. at

UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 08-3034

———————————

ANTOINE JONES,                                                    Appellant,

     v.

UNITED STATES OF AMERICA,                                         Appellee.

GOVERNMENT'S OPPOSITION TO APPELLANT'S MOTION FOR RELEASE
PENDING NEW TRIAL AND SUPPLEMENT TO MOTION FOR LEAVE
TO FILE MOTION FOR RELEASE

The United States of America, by and through its attorney, the
United States Attorney for the District of Columbia, hereby
opposes appellant Antoine Jones's pro se motion for release pending
appeal (Document No. 1285934), and his supplement in support of
that motion, which was filed through counsel (Document No.
1286087). Appellant is not entitled to release pending appeal.

## BACKGROUND

Appellant Antoine Jones was charged with various offenses
related to cocaine trafficking, including conspiracy to distribute
and to possess with intent to distribute five kilograms or more of
cocaine, and fifty grams or more of cocaine base, in violation of
21 U.S.C. §§ 841 and 846 (Document No. 88). Appellant's first
trial ended in a mistrial as to the conspiracy count. His second
trial began on November 15, 2007, and ended on January 10, 2008,
when he was convicted on the conspiracy charge (Document No. 444).

7

Garcia did not have any legitimate business with either Jones or the Levels nightclub (App. 839), and that the many brief meetings Jones conducted in locations along Branch Avenue, Maryland, and at the Levels nightclub, were for the purpose of exchanging cash for cocaine (R.M. 174, 182, 188-90, 231-32).

In addition, the government made repeated and detailed proffers in the district court supporting the district court's determination that appellant was ineligible for pretrial release (see Document Nos. 52, 57 (including 33-page proffer), and 85). The government's proffers (see Documents 52 and 57) included much of the same information that was admitted at appellant's trial. In addition, the government proffered that based upon witness information, a review of appellant's telephone conversations from jail, and a search of his jail cell, the government had "strong reason to believe that Jones was attempting to identify and locate potential government witnesses with the intent to intimidate them or worse" (Document No. 85 at 2)(see also Document No. 57 at 5).

B.    The Court Should Extend the Stay of the Mandate

Pursuant to Rule 41(d)(2) of the Federal Rules of Appellate Procedure, the United States respectfully moves this Court to extend the stay of the  issuance of the mandate in this case so the Solicitor General may determine whether to file a petition for a writ of certiorari in this case.

(Exhibit #10)

DEC 02 2005 16:28 FR UWAU                    TO                    P.02/02

# Memorandum

United States Attorney
District of Columbia



| Subject | Date |
|---|---|
| Request for Lockdown<br>Antoine Jones<br>DCDC 241912 | December 2, 2005 |

| To: | From: |
|---|---|
| DC Jail | USAO/DC |

AUSA ████████ has indicated in a previous request, dated November 23, 2005, that inmate Antoine Jones, DCDC 241912 should placed immediately in lockdown at the DC Jail. Please ensure that Mr. Jones is lockdown until further notice.

If you have any questions, please call me at (2)████████ or Rachel Lieber at (2)████████

Thanks

DEC 22 2005 12:42 FR UVAU                    ~~TO~~                    P.02/11

# Memorandum

*United States Attorney*
*District of Columbia*

| Subject: | Date: |
|---|---|
| Continuing Problems with Prisoner Antoine Jones, DCDC 241-912 | December 22, 2005 |

| To: | From: |
|---|---|
| Warden, District of Columbia Jail | Assistant United States Attorney |



On November 23, 2005, the United States Attorney's Office made a written request to the D.C. Jail, that the aforementioned prisoner, Antoine Jones (DCDC 241-912) be placed in protective custody, based on growing concerns that Mr. Jones was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in his narcotics conspiracy case being prosecuted in United States District Court for the District of Columbia. Nine days later, on December 2, 2005, it came to my attention, while ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that he was continuing to make telephone calls from the Jail, which led me to believe that he remained in population. With the aid of members of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I learned that Jones did, indeed, remain in population. Thus, we renewed our request to have him transferred to protective custody, to ensure the safety of various individuals, and the integrity of the investigation.

According to Jail records investigators received last Friday, December 16, 2005 and examined this week, while Jones has been transferred to protective custody, he continues to somehow have telephone privileges. This completely undermines the purpose of his being in that placement - ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, some of the basis for the government's concern regarding Jones's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I have attached copies of the most recent Department of Corrections call logs. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DEC 22 2005 12:42 FR VWAU                              TO                     P.03/11

The U.S. Attorney's Office and the F.B.I. are very concerned that Antoine Jones ██████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ Please consider this memorandum a formal request for an immediate investigation into this situation, to include an examination of how these clear violations occurred, and more importantly, an immediate correction of the problem.

Please feel free to contact me at (202) ████████ (office) or (202) ████████ (cell), if you have any questions.

2

Please feel free to call me with any follow-up questions, once you've had a chance to review the enclosed.

Sincerely,

*Rachel*

Rachel Carlson Lieber
Assistant United States Attorney

Enclosures

DEC 02 2005 16:26 FR VWAU                    2023534898 TO ▓▓▓▓▓▓         P.01/02



U.S. Department of Justice
United States Attorney
District of Columbia

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*



# FAX

To:                                          From:
**DC Jail**                                   **USAO/DC**
(202)▓▓▓▓                                      (202)▓▓▓▓

Fax:                                         Phone:

Date:        December 2, 2005

Re:          Request for Lockdown: Antoine Jones

Page(s):     2 including cover

COMMENTS:

> Please place Antoine Jones immediately in lockdown. If you have any questions,
> please call me on the telephone number listed above.
>
> Thanks

---

## U.S. ATTORNEY FACSIMILE COMMUNICATION

*WARNING: Information attached to this cover sheet is U.S. Government Property.
If you are not the intended recipient of this information, disclosure, reproduction,
distribution, or use of this information is prohibited. Please notify the originator
immediately to arrange for proper disposition.*

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/30/2005

███████████████ [**PROTECT IDENTITY**], was advised of the nature of the interview and the identity of the interviewing agent.  He then provided the following information:

On the evening of November 22, 2005, a man named CARLOS, aka "LOS" [CARLOS PHILLIPS] was shot in the head and died.  He was shot in the 2200 block of Savannah Terrace, S.E., WDC.  CARLOS has a brother named LAMONT who is incarcerated.  At the time of his death, CARLOS was driving a burgundy Buick Riviera which was registered to his mother.

DARNELL JACKSON, aka "FATS," is the owner of the Senate Inn Sports Bar, located at 5000 Marlboro Pike, Capitol Heights, Maryland.  On the evening of November 27, 2005, JACKSON was hosting a party at his club for teenagers aged 15 to 18. During the party, one of the male teenagers was shot in the leg.

FRANK RAWLINGS was arrested in mid-November of this year.  ███████ initially heard RAWLINGS was arrested in possession of marijuana and a gun.  However, ████████ spoke to RAWLINGS after he was released from prison, and RAWLINGS said he was arrested for Assault.  While he was in the D.C. Jail, RAWLINGS spoke with several of the incarcerated conspirators in the ANTOINE JONES narcotics investigation conducted by the FBI. Those persons told RAWLINGS that they had obtained paperwork on their case which made them believe that KIRK CARTER had also been charged in the same conspiracy.  They believed that CARTER was incarcerated on that charge for only a day or two, and must be back out on the street because he was "snitching."  RAWLINGS is doing everything he can to spread the word about CARTER in the hope that someone will kill CARTER.

███████████ knows KIRK CARTER is currently using cellular telephone number 202-437-0047.  CARTER is associated with DARRYL BLAYLOCK, aka "MOOKIE."  BLAYLOCK has recently used telephone number 301-741-2146.  BLAYLOCK has a brother who is nicknamed "POOKIE."  One of POOKIE's associates is (FNU) HENSON.

███████████ previously provided information regarding a major distributor of PCP in WDC named ERIC (LNU).  ERIC is currently using cellular telephone number 202-725-3384.

---

Investigation on    11/30/05    at  Washington, D.C.

File #  245F-WF-227911 SUB 302    Date dictated _____

by   SA Timothy J. Ervin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

(Exhibit #12)

# DECLARATION

I, Kirk Carter, hereby attest that I have no animosity toward Antoine Jones or Frank Rawlings for any reasons. I by chance obtained a document which indicated and implied that my life was in danger. The document stated that a F.B.I. source told them the following statements:

> "Frank Rawlings was arrested in mid-November of this year (2005). The source initially heard Rawlings was arrested for possession of marijuana and a gun. However, SOURCE spoke to Rawlings after he was released from prison and Rawlings said he was arrested for assault. While he was in the D.C. Jail, Rawlings spoke with several of the incarcerated co-conspirators in Antoine Jones narcotics investigation conducted by the F.B.I. Those persons told Rawlings that they have obtained paper work on their case which made them believe that Kirk Carter was incarcerated on that charge for only a day or two, and must be back on the street because he was a "snitching." Rawlings is doing everything he can to spread the word about CARTER in the hope that someone will kill CARTER.

This information was provided by a **FBI SOURCE** and is a fabricated lie. This entire statement isn't true and Jones and Rawlings are good friends of mine. It is my belief that the FBI SOURCE created this fabrication to gain some type of favor in his behalf. I am a co-defendant to Antoine Jones' case and he fully knows that I am not involved in any type of statements against his case and I am unaware of any statements. Furthermore, the court records will show that I was first arrested in this case in January 2006, three months after these false statements were made. It is impossible for me to have been arrested and released before or during the time Rawlings spoke with several of the people on the case at D.C. Jail. For the record, I was first approached about the alleged rumor of

someone doing bodly harm to me from the FBI agents who came

to my job (3) times between November thur January 2006. When

they arrived they asked to speak to me privately. I stated to

them that I have nothing to hide and whatever it is can be said

right here in the presence of my supervisors.  They indicated

that thier information recieved stated that someone was trying

or planning to kill me and would I know, why?  I told them I

heard nothing about it but for the record I'll say this,

" If it's true, then let them come because I will do what I

have to do, to defend myself. "  When the FBI came to my job

(3) three Supervisors were presenced, **Allan Toller**, **Jim Bland**

and **Anthony Gooding**.  S/A Horton pulled me to the side, then

opened afolder exposing a large picture of Antoine Jones and

asked do I know him ?  I said yes, she then asked what can I

tell her about him .  I replied nothing .  The agent looked

at me and said we will be back to speak with you again .  I

said I'm here but if I'm not then just have my boss call me

because I might be on a company errand. Eventually I did recieve

a call from the job saying the agents were there looking for

me. I told the job to tell them I'm on my way there now. Once

I arrived they informed me that they weren't there to question

me, they were there to arrest me, and I said lets go .

June 23rd 2008
Page-3 of 3

I have known Antoine Jones for (12) to (13) years and I never made any statements against him to anyone.  I have known Frank Rawlings for over (20) years and never made statements against him.  Both men and I share a past and present relationship of mutural respect for one another.  We interact on sports, seen one another at entertainment events and social gatherings. Never have I then, nor do I now, believe that these statements made by the FBI SOURCE have any truth to them concerning the allege statements by Rawlings nor myself. As I indicated before in this case my first arrest occured in January of 2006 and if the agents believed there SOURCE, it's his statement against the court.

_Kirk Carter_
Mr. Kirk Carter
FBD#
Rivers Corr. Inst.
P.O. BOX 630
Winton, N.C. 27986

_Cindy L. Vann_
Notary Public

State of North Carolin, County of Hertford
Signed before me on this 23 day
of June 2008 by April 30, 2011
Notary Public Cindy L. Vann

CINDY L VANN
NOTARY
PUBLIC
HERTFORD COUNTY N.C.

1                    UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF COLUMBIA

2    - - - - - - - - - - - - - - - - - - - - - - -X

3    UNITED STATES OF AMERICA    Criminal Case Nos.

4              v.          05-386 (1-10)    **FILED**

5    ANTOINE JONES, et al.,            NOV  2 2006

6         Defendants,          NANCY MAYER WHITTINGTON, CLERK

                                       U.S. DISTRICT COURT

7    - - - - - - - - - - - - - - - - - - - - - - -X    Washington, D.C.

                                   Friday, March 17, 2006

8                                     9:50 A.M.

9               TRANSCRIPT OF STATUS CONFERENCE

           BEFORE THE HONORABLE ELLEN SEGAL HUVELLE

10              UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:       JACK GEISE, AUSA

                          RACHEL LIEBER, AUSA

13                       Office of U.S. Attorney

14                       555 Fourth Street, N.W.

                          Washington, D.C.  20560

15                       (202) 616-9156

16   For Defendant Jones:      EDUARDO BALAREZO, ESQ.

                          Law Offices of Eduardo Balarezo

17                       400 Fifth Street, N.W.,

                          Suite 300

18                       Washington, D.C.  20001

                          (202) 639-0999

19

20

21   Court Reporter:          Lisa Walker Griffith, RPR

                          U.S. District Courthouse

22                       Room 6409

                          Washington, D.C.  20001

23                       (202) 354-3247

24

25   Proceedings recorded by mechanical stenography, transcript

    produced by computer.

1          The second question, is the government still

2   insisting that Mr. Jones be put in lockdown 23 hours a

3   day?  I find it totally unsatisfactory --

4          Mr. McDaniel, where have you been?

5          MR. McDANIEL:  May I approach?

6          THE COURT:  Just a minute, I'm in the middle

7   of something.

8          Can you tell your client you are here?  He

9   has been arraigned.

10         MR. McDANIEL:  Yes.

11         THE COURT:  Is there any way this can be

12  addressed because I will have an evidentiary hearing.

13  I'm not satisfied with the notion that somebody in

14  this case could take a long time to get through.  If

15  he is in lockdown 23 hours a day, I'm going to have to

16  find out whether this is the least restrictive way,

17  and what are the real concerns here.  I'm not

18  satisfied.

19         MR. GEISE:  Your Honor, if the Court would

20  give me a few days. I will explore with the people who

21  handle our contacts at the jail and with the jail,

22  what the options are.  We obviously have some concerns

23  about communications.

24         I'm not sure if there are other things that

25  they can do that are less than lockdown that will

1    still satisfy our concerns.  I would like to actually

2    talk to the people at the jail to find out what the

3    options are.  So, we can propose something in the

4    interim, not an immediate step.

5         THE COURT:  You talk to Mr. Balarezo.  The

6    other problem here is that one of the options that

7    we've had to do in the past is to move them.  You

8    know, there are other institutions that are not far

9    away and won't interfere with your counsel, whether

10   we've, we've had people in Alexandria.  We've had

11   people in Orange County.

12        If the problem is that communication among

13   people in the jail, if that is a problem, and they

14   have reason to believe that there is a problem, that

15   is another option.  But --

16        MR. BALAREZO:  Your Honor, my understanding

17   at least from the government's response to the motion,

18   is that the issue was not communication between

19   Mr. Jones and others in the jail.  It was

20   communication with Mr. Jones and people outside.

21   Based on the government's response, Your Honor, all I

22   see here is that the confidential source reported a

23   rumor about the guys from Levels.  That is just

24   totally insufficient.

25        THE COURT:  There is more to it than that.

 1    I'll put them to their proof if they can't come up

 2    with something different.  They have letters and

 3    conversation by phone.  But I want to hear it.  I'm

 4    just not satisfied with them getting up here and

 5    saying that in some way he sent out a message.  That's

 6    not satisfactory.

 7            MR. BALAREZO:  I can tell the Court that

 8    part of the allegations that the government is making

 9    regarding his communications with other individuals

10    and the information that he was seeking, he was doing

11    it at my request.

12            THE COURT:  I understand that.  I'm not

13    satisfied with either side making little

14    representations here.  It is not satisfactory.  I am

15    also not willing to just accept the notion that he is

16    in lockdown 23 hours a day until this case gets

17    finished.  I didn't order that.  And I don't know what

18    justified it.  But I'm trying to work around your

19    Friday schedules here.  I want it solved or I want the

20    government to come up with its proof.  I can do it the

21    24th.

22            MR. BALAREZO:  Your Honor, I will be

23    available probably after 2:30.

24            THE COURT:  I'm sorry.

25            MR. BALAREZO:  In the morning?  I have a

1    couple of matters --

2         THE COURT:  I could try to have a hearing on

3    it after 11:00.

4         MR. BALAREZO:  That's fine, Your Honor, I

5    have a 12:30 with Judge Collyer and a 1:30 with Judge

6    Urbina.

7         THE COURT:  I would do it before then.  I

8    would like you to try to figure out alternatives.  I

9    certainly have no interest in allowing any kind of

10   communications that are improper in any way.

11         It may be that they can monitor

12   communications going in and out of the jail without

13   having him locked up 23 hours a day.  I don't get it.

14   I don't know whether CTF is available or close by

15   institutions.

16         If you are worried about communications in

17   the jail as opposed to people coming and going, all

18   right.  But if you want to keep him under these

19   conditions, I want you to come forth with the proof.

20   Some of it may be ex parte, but he is entitled to have

21   a real hearing on this.  You can respond where there

22   may be some things that are not going to be produced.

23   But if you want it, you produce it instead of people

24   just saying things.

25         March 24 at 11:15.  This is Mr. Jones only

1   on the question of his motion, conditions.  Hopefully,

2   you'll be able to solve it before then.  If you do,

3   let me know.  And we can cancel the hearing.  And we

4   will be back on the day we picked for the status.

5            Is there anything further other than

6   Mr. McDaniel?

7            Does he need to be here?

8            If you continue to ask for these particular

9   conditions, you better have your live witnesses and

10  evidence.

11           MR. GEISE:  As the Court recognized some may

12  be ex parte.

13           THE COURT:  I understand there could be

14  some.  I'm not going to require you to reveal the

15  confidential source.  But if all we're dealing with is

16  rumor out there, there is a limit on how you can have

17  it be 23 hours a day.

18           Mr. Daum, are you waiting on me?

19           MR. DAUM:  I'm just waiting to be excused.

20           THE COURT:  All right.  11:15 for Mr. Jones.

21           MR. McDANIEL:  Your Honor, Mr. Holland is in

22  the back.  I don't know what we need to --

23           THE COURT:  Can the marshals bring

24  Mr. Holland out or is that not feasible?

25           MR. McDANIEL:  May I approach?