USCA Case #12-XXXX    Document #XXXXXXX    Filed: 10/30/2012    Page 1 of 80

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

NOV 28 2012

RECEIVED

___ Jones
Plaintiff

V.

RACHEL C. Lieber - A.U.S.A
NORMA HORNE - M.P.D Detective
Dennis HARRISON - C.D.F WARDEN
    Defendant's

Amended COMPLAINT to Petitioner
60(B) motion (FRAUD on the court).

Petitioner is Requesting Leave to
Amend His PAST 60(B) motion (FRAUD)
on the court).

Petitioner submit A FRAUD on the
court motion sometime eARLY 2011
And this court denied Petitioner
leave to File His 60(B) motion on 5-20-201
Petitioner APPEAL the denIAL of
the 60(B) to the court of APPEAL.

On September 21, 012 the court of
APPEAL Remanded Petitioner
complaint to district court to
File Petitioner 60(B) motion (FRAUD)
on the court).

Mail Room

26 2012

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

PLAINTIFF WANT TO POINT OUT THAT
PLAINTIFF due diligently been
complaining And Arguing

1) On december 2 2005 WARDEN
HARRISON Allow some unknown name
F.B.I Agents to unlawfully enter
PLAINTIFF DC JAIL Cell.

2) On december 2 2005 (without
Probable cause). AUSA Rachel C.
Lieber send A memorandum.
Requesting WARDEN HARRISON to
illegally place PLAINTIFF in solitary
confinement-segregation under
total seperation, stripping Away
PLAINTIFF due Process Rights, no
MAIL Privileges, no social visits, no
PHONE Privileges, PLAINTIFF wAs'nt
Allow to cALLed PLAINTIFF LAWYERS.
[see exhibit #1 -AUSA Rachel C
Lieber memorandum to WARDEN
HARRISON].

3) WARDEN Dennis HARRISON
violating PLAINtiff 4th Amendment
when WARDEN HARRISON Allow
AUSA Rachel C Lieber and M.P.D
Detective NORMA Horne to Received

Shipment of Plaintiff DC Jail
conversation.

4) Detective NORMA HORNE violated
18 USCS 2235              when she
was Reckless disregard to the
truth in Her Affidavit And when
she deliberately misleading And
deceiving the courts in Her Affidavit

5) AUSA Rachel C Lieber And M.P.D
Detective violated Attorney
client Privilege communication
when they send their Investigator
FBI Agent Jimmy F. Pope Jr, FBI
Agent Stephen R. Nausle And FBI
Agent John C Bevington to executed
the search of Plaintiff DC Jail
cell on November 25 2005, also
violating "Taint Procedures"
because Both "Agent Stephen R Nausle"
And John C Bevington was Part of
Plaintiff Criminal Investigation
And worst the specials Agents
gave Plaintiff Personal Property
And Attorney client communication
to AUSA Rachel C Lieber the
Prosecutor who Prosecuted Plaintiff case.

PG 4

6) AUSA Rachel Lieber F.B.C Investigators seized Property that wasn't on the WARRANT Attachment A, clearly Exceeding their Authority and violating Plaintiff 4th Amendment.

## Defendant's False Allegations

Defendant NORMA Horne claimed that Plaintiff Antoine Jones "Attempted Obstruction of Justice and witness tampering in Her Affidavit

Also NORMA Horne claimed that Antoine Jones was still engaging in NARCOTICS - related activities from His Jail cell, with LAWRENCE MAYNARD.

In AUSA Rachel C. Lieber memo to WARDEN HARRISON, she Requested for Plaintiff to be place in Immidiately lockdown at the DC Jail.

In AUSA Rachel Lieber litigation she stated there was "rumors" reported by a confidential source

P 65

that the "guys from levels" wanted to HARM suspected cooperator. AUSA Lieber also cited a letter from a friend of MR Jones informing Him of the whereabouts of a suspected cooperator. Finally, the government point to a list of name found in MR Jones cell during a search to suggest that MR Jones may pose a danger to government witnesses.

AUSA Rachel Lieber writes in Her litigation that that since MR Jones arrest, Jones Has attempted to contact MAYNARD from JAIL in a suspicious manner. According to the Government, MAYNARD told His girlfriend that if she received Any letters from Him (Jones) without Her name on them, she should give them to MAYNARD. The fact that Jones Has according to the Government, attempted to contact MAYNARD in a surreptitious manner leads Her to believe MR Jones continue His narcotics operation.

AUSA Rachel Lieber believe that

Jones in fact made phone calls
to attempt to influence witnesses.

In A memorAndum dated march
1 2006, from WARDen HARRison to
PLAintiff, WARDen HARRison explained
Per the U.S Attorney's Office
Request you are to be PLACed in
Total Seperation from General
population also place phone Restriction,
mail Restriction and social visit Restriction
PRivileges. Therefore, you were
place on total seperation.

STAtement of FACts

1) On December 2 2005 before
PLAintiff WAS PLACe in solitary
confinement, the officer took
me to my cell, When I ARRived in
the detail unit, Sgt PoRter
explained to me that some federal
officers HAs enter and searched
my JAil cell, the officer Allow
me to PAcked my PRoperty
When my cell-mate told me that
the fed's searched my property
and took some of my property, I

P(7)

ASK Inmate Tracy McKeithon
Did they Have A WARRANT,
MR McKeithon SAID NO.

(EXHibit #2) IS A SWORNED AFFIDAVit
that Inmate Terrence SAunders
eloborate on the Day the FeDS
enter PLAintiff cell while I
WAS House in the detail Unit,
MR SAunders go into detail what
Happen the Day the FeDS illegally
enter My JAil cell on December2 05.

   I like to direct the court to
MARCH 24 2006 11:30Am, A
Hearing in PLAintiff CRIMINAL
Pretrial, PAge 21 Line 15-18, Line22
   MR. BAIARUZO: Your HONOR, the
cell search WAS "December 2" is
my understanding, My Understanding
is that MR Jones WAS pLAceD in
Lock Down the SAme Day.
   Line 22: The Court: December2, yes.

           Conclusion
   In many litigation plaintiff
Due Diligently complaint and
Argued that WARDen Dennis Harrison

And AUSA Rachel C. Lieber allow
some unknown name FBI agents to
enter and searched Plaintiff cell
on December 2 2005, And AUSA
Rachel Lieber and Warden Dennis
Harrison continue to conceal
this Unlawful searched and
Plaintiff 4th Amendment
Violation, Matter of a Fact
AUSA Rachel Lieber in the
court of appeal, Duck, Dodge
And continued to not Admit or
concede that some of Her
Investigator unlawfully enter
Plaintiff D.C Jail cell on December
2 2005.

Special note: For this court to
see and for the Plaintiff to be
able to show more clear and
convincing evidence on the
unlawfully searched on December
2 2005, Plaintiff is Humbly And
Respectfully Requesting for the
MARCH 24 2006 And the APRIL 24 2006
Hearing be unredacted to it's
fulliest, And Also Plaintiff need
(November 23 2005, December 2 2005,

f69

December 22 2005 ). memorandum
From U.S department of Justice -
United states Attorney office of
District of columbia to the warden
of DC Jail to be unredacted to it
fulliest.

To show for a fact that AUSA
Rachel Lieber knew that not only
that Detective Horne allegation
of Plaintiff obstruction of
Justice, Tampering with witness
and was trying to kill suspected
witnesses, was Reckless and A
Fabricated story, AUSA Rachel
Lieber knew on <u>11-30-2005</u> before
the <u>December 2 2005</u> unlawful
searched of my DC Jail and illegally
Placing me in Solitary confinement
under total separation status,
that the Government Had concrete
statements and evidence that I
was innocent of all obstruction
of Justice allegation and the
Government should not Have enter
or searched Plaintiff cell nor
should Plaintiff Have been
place in segregation under

PUID

Total seperation. See (Exhibit # 3)
A FD-302 Debriefing Interview.

In this debriefing interview, it
goes into detail that Frann Rawling
was arrested (some one I dont know
and never met), while Rawling was
arrested in DC jail the source said
Rawling spoke with several of the
incarcerated conspirators in the
Antoine Jones narcotics Investigation
the source told Rawling that they
had obtained paperwork on their
case which made them believe
that Kirk Carter had also been
charged in the conspiracy.
The source stated they believe
that carter was incarcerated on
that charge for only a day or two,
and must be back on the street
because he was "snitching" Rawling
is doing everything he can to spread
the word about carter in the
hope that some one will kill carter.
The fact is there no where
in this debriefing it says Rawling
spoke with Antoine Jones or even
knew Antoine Jones.

P611

The Facts is it state that Rawling is doing everything He can to spread the word about Carter "snitching" in the Hope that someone will kill Carter, not Antoine Jones or Any coconspirator in Plaintiff criminal Investigation. This information was known on 11-30-2005, which should Had clear Plaintiff of obstruction of Justice or Any witness tampering.

AUSA Rachel Lieber and Detective Horne knew the Hearsay Allegation in the 11-30-2005 debriefing was FAR from the truth because they knew that Kirk Carter was not Arrested on october 24 2005 or before 11-30-2005, there was F.B.I Agents who went to Kirk Carter Job to tell Kirk Carter that someone wanted to Harm Him, knowing it was a lie.

2) The Facts is AUSA Rachel C. Lieber wanted to get A technical Advantage in their Investigation And Her Goal was to place me in segregation under total separation And no communication with my

P12

codefendant's or any one from the outside that could assist me with my criminal case.

All AUSA Rachel Lieber and Detective NORMA HORNE HAD WAS unsupported "Rumors" Reported by an unrelated confidential source that the "guys" from Level's wanted to Harm a suspected cooperator (Kirk Carter).

The government also cited a letter from a friend of Mr Jones informing Him of the whereabout of a suspected cooperator (Donald Hunter). See (Exhibit #4) where Ms Beverly Johnson go into detail about me asking her to find the whereabout of a close friend (Donald Hunter) and a guy the word on the street that was suspected to be Hot, a informer and cooperator for the government, some one I thought my lawyer (Mr Balarezo) would thought could Help our defense.

AUSA Rachel Lieber belief that

Plaintiff was continuing some type of criminal activity mentioning a letter for Ms Deborah O'Neal ~~through~~ to Lawrence Maynard.

AUSA Rachel Lieber is off target with her allegation about the letter to Mr Maynard.

(Exhibit #5) is Ms Deborah O'Neal sworned declaration stating that I called her giving instruction on a letter coming to her house with Bryant name on it.

(Exhibit #6) is Mr Brian Waddell sworned statement explaining the letter he received from Ms O'Neal.

## Conclusion

Plaintiff DC Jail conversation will expose the defendants fabrication and the conversation are plaintiff talking to his family, friends, lovedones and business associates.

3) For seven years the defendant continue to conceal they knew it is a 4th Amendment violation to illegally listen to plaintiff DC Jail

conversation and when warden
Harrison allow the defendants
to received shipment of Plaintiff
DC Jail conversation.

In Plaintiff criminal Pretrial,
MR BALARZO writes in A footnote
in Defendant's motion to suppress
Tangible Evidence from Defendants
Jail cell, (Page 6 footnote 1), Exhibit #7)
The footnote Reads: Jones also
moves to suppress these calls because
upon information and belief, "the
government did not obtain these
calls pursuant to a lawfully
authorized subpoena or warrant.

In Ausa Rachel Lieber opposition
in Plaintiff criminal trial page
17 (Exhibit #8) and in Plaintiff
civil case in the court of appeal page
93 (Exhibit #9), Ausa Lieber deceived
and mislead the courts by acting
like she didn't know it was A
4th Amendment Violation and an
18 USC 2510 violation to illegally
received and illegally listen to
Plaintiff DC Jail conversation.

Pbls

## Conclusion

Both Warden Dennis Harrison and AUSA Rachel Lieber knew that they was not only violating Plaintiff 4th Amendment, they was violating District of Columbia Department of Correction - Program statement 4020.13(e) Monitoring and Recording inmate Telephone. Exhibit #10

The Program statement Reads: Call data Record and Recording of inmate telephone calls Are considered sensitive and shall not be released without a subpoena or other appropriate Legal order.

The Program statement alone is clear and convincing evidence that to give the Government shipment of Plaintiff DC Jail conversation And illegally Listening to Plaintiff DC Jail conversation by the Government (AUSA Lieber, Detective Horne) is A 4th Amendment violation by all three defendants

Attorney client communication Privilege.

Plaintiff enclose as (Exhibit #11)

March 24 2006 1130am Hearing, where Plaintiff lawyer Mr Balbrego, states that He is an Officer of the Court and that He gave me instruction Plaintiff to try to find potential witnesses and cooperating witnesses so we could prepare for our defense and for my criminal trial.

Once trint team procedures was violated by Agent Stephen Nagle and agent Bevington, when both who was part of Plaintiff Investigation, Agent Searched Plaintiff Moore st house and Bevington monitor Plaintiff wire tap conversation and testified at Plaintiff trial, the trint procedure was violated when these agents gave Plaintiff Attorney client communication to AUSA Rachel Lieber the Prosecutor who prosecuting Plaintiff case.

## Conclusion

(Exhibit #12) Is copy of Plaintiff Attorney client communication and evidence of Plaintiff defense for his criminal trial.

The list that the defendant mentioned contain list of names who were potential defense witnesses, potential government cooperators and names in the affidavits.

(Exhibit #12) Is the phone numbers Plaintiff mentioned in the hearing on March 24 2006 11:30 am
Page 23 line 11-18.

The defendant: I'm trying to understand because it seems like right now I'm being railroad. You are talking about a list that I can break down to you. "It is a telephone list". Okay, my lawyer asked me, we're trying to prepare for a case. Okay, he asked me about certain witnesses that we talk about. Okay. The list that y'all talking about, "it is a telephone list."

(Exhibit #13) is the wire tap affidavit Plaintiff spoke of on page 24 of the 3-24-2006 11:30am Hearing.

Plaintiff mentioned they were mental notes from the affidavits preparing for my defense

(Exhibit #14) Is a letter From
Beverly Johnson

(Exhibit #15) Are two personal
letters one From my wife Deniece
Jones and one From my cousin
Alonzo Gibson, Niether letter was
on the Warrant Attachment A, as
property to seize, A clear violation
of Rule 41(E) And Plaintiff 4th
amendment.

## Rule 17 violation

AUSA Rachel C. Lieber tried to
build a case with Her Obstruction
of Justice Allegation by calling
and subpoena <u>Ms Beverly Johnson</u> and
<u>Ms Deborah O'Neal</u> to the Grand Jury
but to only intercept both Grand
Jury witnesses, interviewing both
ladies. In the interview AUSA
Rachel Found out the truth that
Plaintiff was innocent of the obstruction
of Justice And witness tampering claim.
(Exhibit #16) is Deborah statements
at the Government debriefing
interviews.

Conclusion

Defendant AUSA Rachel Lieber
Knew after interviewing both
Ms Beverly Johnson and Ms Deborah
O'neal that there was never any
obstruction of Justice by Plaintiff,
this is why she didnt let neither
of the ladies testified in the
Grand Jury, plus she couldnt get
an indictment of obstruction of
Justice because all alone, it was
a fabricated story complete with
Reckless Hearsay.

(Exhibit # 17) is two court orders
from Honorable Judge Huvelle
overriding AUSA Rachel Lieber
memorandum to place Plaintiff
in segregation under total separation

The order show clear and
convincing facts that AUSA
Rachel Lieber was in the wrong
for Requesting Plaintiff to be
in solitary Confinement with
out any court order.

Plaintiff will conclude by saying

that in a criminal case, I has a greater legal interest and right network and communicate with his codefendants or potential witnesses to build a complete defense, more so than the government.

I will finish with a paragraph from the 3-24-2006, 11:30 am Hearing. Page 28 Line 17-20.

The court: I think you better do better, I'm telling you. "I'm ordering it". So, it's not a question of just you either "have to find more humane conditions in the jail"

## Relief Sought

Plaintiff is requesting for the ~~state to~~ Defendant's to Respond on these serious claims of Dishonesty, based on the court and Plaintiff 4th Amendment rights violation.

Plaintiff Requesting for a conference Hearing so that all parties can present their facts or discuss settlement, or discuss proceeding to a Jury trial.

Respectfully Submitted Antoine Jones

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 11-5191**                                    **September Term, 2012**

**1:07-cv-01027-RJL**

**Filed On:** September 21, 2012

In re: Antoine Jones,

        Petitioner

**BEFORE:**     Tatel, Griffith, and Kavanaugh, Circuit Judges

## O R D E R

Upon consideration of the petition for writ of mandamus, the supplements thereto, the response to the petition, and the reply; the motions for appointment of counsel and the supplement thereto; and the motions for discovery, it is

**ORDERED** that the motions for appointment of counsel be denied.  It is

**FURTHER ORDERED** that the motions for discovery be denied.  It is

**FURTHER ORDERED** that the petition be granted and the district court be directed to file petitioner's motion.  See In re Williams, No. 10-5122, unpublished order (D.C. Cir. Jan. 4, 2012) (Griffith and Kavanaugh, JJ.; and Ginsburg, S.J.).  At this time, the court takes no position on the merits of petitioner's motion or its timeliness under Fed. R. Civ. P. 60(b)(3) and (d), and Baltia Air Lines, Inc. v. Transaction Management, Inc., 98 F.3d 640, 642-43 (D.C. Cir. 1996).  See also Standard Oil Co. v. U.S., 429 U.S. 17, 17-19 (1976) (per curiam).

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to transmit a copy of this order to the district court.

**Per Curiam**

(EXHIBIT #1)

DEC  2 2005 16:28 FR VWAU                                      P.02/02

# Memorandum

*United States Attorney*
*District of Columbia*

| Subject: | | Date: |
|---|---|---|
| Request for Lockdown Antoine Jones DCDC 241912 | | December 2, 2005 |

| To: | From: |
|---|---|
| DC Jail | USAO/DC |

AUSA ████████ has indicated in a previous request, dated November 23, 2005, that inmate Antoine Jones, DCDC 241912 should placed immediately in lockdown at the DC Jail. Please ensure that Mr. Jones is lockdown until further notice.

If you have any questions, please call me at (2) ████████ or Rachel Lieber at (2) ████████

Thanks

(Exhibit #1)

Case 1:07-cv-01027-RJL   Document 39-1   Filed 04/19/08   Page 6 of 118

DEC 02 2005 16:26 FR UUAU                  2028534898 TO ████████        P.01/02

 **U.S. Department of Justice**
United States Attorney
District of Columbia

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

 # FAX

| | | | |
|---|---|---|---|
| **To:** | DC Jail ████ | **From:** | USAO/DC |
| | (202) ████ | | (202) ████ |
| **Fax:** | | **Phone:** | |
| **Date:** | December 2, 2005 | | |
| **Re:** | Request for Lockdown: Antoine Jones | | |
| **Page(s):** | 2 including cover | | |

**COMMENTS:**

Please ████████████████████████████████ If you have any questions, please call me on the telephone number listed above.

Thanks

---

## U.S. ATTORNEY FACSIMILE COMMUNICATION

*WARNING: Information attached to this cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited. Please notify the originator immediately to arrange for proper disposition.*

DEC-02-2005 04:27PM   From: ████████          ID:              Page:001   R=97%

A126

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Central Detention Facility

MEMORANDUM

TO:        For the Record
SUBJECT:   Housing Request



I hereby waive Protective Custody. I understand that I may be placed in general population in any of the D.C. Department of Correction facilities.

I hereby request the following Housing:

_____ Protective Custody        ____✓_____ General Population

If Protective Custody has been requested, give reason below: (Check One)

_____
_____

__✓ I am not separated from anyone nor do I have any known enemies at the D.C. Detention Facility.

____ I am separated from or require separation from the following inmates:

Separatee Name_____

Reason:_____

    Staff Action:_____ General Population
                 _____ Protective Custody-Refer to Housing Board
                 _____ Separatee not at the Detention Facility

Separatee Name:_____

Reason:_____

    Staff Action:_____ General Population
                 _____ Protective Custody-Refer to Housing Board
                 _____ Separatee not at the Detention Facility

Separatee Name:_____
Reason:_____

    Staff Action:_____ General Population
                 _____ Protective Custody-Refer to Housing Board
                 _____ Separatee not at the Detention Facility

I have received an orientation relative to the rules and regulations of the D C Detention Facility and have been advised of the housing arrangements at this facility. I request housing as indicated above.

_____ Antoni ) c.n.s _____ 241912 _____ 11-1-07

Approving Authority:_____ _____ CTS
                         Signature                    Title

**A125**

DEC 22 2005 12:42 FR VWAU                                    P.02/11

# Memorandum

*United States Attorney*
*District of Columbia*

| Subject: | Date: |
|---|---|
| Continuing Problems with Prisoner Antoine Jones, DCDC 241-912 | December 22, 2005 |

| To: | From: |
|---|---|
| Warden, District of Columbia Jail | Assistant United States Attorney |

On November 23, 2005, the United States Attorney's Office made a written request to the D.C. Jail, that the aforementioned prisoner, Antoine Jones (DCDC 241-912) be placed in protective custody, based on growing concerns that Mr. Jones was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in his narcotics conspiracy case being prosecuted in United States District Court for the District of Columbia. Nine days later, on December 2, 2005, it came to my attention, while ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that he was continuing to make telephone calls from the Jail, which led me to believe that he remained in population. With the aid of members of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ I learned that Jones did, indeed, remain in population. Thus, we renewed our request to have him transferred to protective custody, to ensure the safety of various individuals, and the integrity of the investigation.

According to Jail records investigators received last Friday, December 16, 2005 and examined this week, while Jones has been transferred to protective custody, he continues to somehow have telephone privileges. This completely undermines the purpose of his being in that placement - ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Indeed, some of the basis for the government's concern regarding Jones's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

I have attached copies of the most recent Department of Corrections call logs, ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

DEC 22 2005 12:42 FR VWAU                    ████████TO ████████           P.03/11

The U.S. Attorney's Office and the F.B.I. are very concerned that Antoine Jones ███████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Please consider this memorandum a formal request for an immediate investigation into this situation, to include an examination of how these clear violations occurred, and more importantly, an immediate correction of the problem.

Please feel free to contact me at (202) ████████ (office) or (202) ████████ (cell), if you have any questions.

2

Exhibit #2

July 22, 2012

I swear under penalty of perjury (28 USC 1746) that this sworn affidavit is accurate, correct and true.

I Terrence Saunders want to elaborate about a incident that occurred when I was housed on the detail block in the time frame of December of 2005.

During this time a incident occurred when the block was temporary locked down for a short period due to some federal agents entering the block on the side of cells 41 to 80 and searched a cell.

After the search the block was re-opened by Sgt. Porter. Thats when everyone came back out and was wondering what was occurring. At that time I overheard people talking about it was the FBI. And they was searching the dude from the Level's involvement ub case. Later on it was founded out to be Mr. Jones cell. His cellmate had told people that it was the FBI and they supposedly took pictures of his mail and property.

The entire unit was discussing this matter because at the time it was

very big, high profile case in the media.
During this time I was not formly introduced
to Mr. Jones, but heard of a few people speaking
about Mr. Jones that knew him personally, and
about Mr. Antoine Jones case.

   I got to know Mr. Jones by discussing
legal work recently and on July 20, 2012, I
told him (Mr. Antoine Jones) That I remember
when people was discussing that Matter about
him when I was on the detail block and what
had supposedly happen to him. How I remember was
because it was such a big topic discussed because of
all the media involved. Mr. Jones asked me to write
this sworn declaration that is truthful under penalty
of perjury. (**28**. USC 1746)

Terrence Saunders   273-442
1901 D St. S.E.
Washington, D.C. 20003

Teresa Washington
Notary Public, District of Columbia
My Commission Expires  8/14/2013

D-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/30/2005

███████████████ [PROTECT IDENTITY], was advised of the
nature of the interview and the identity of the interviewing
agent.  He then provided the following information:

On the evening of November 22, 2005, a man named
CARLOS, aka "LOS" [CARLOS PHILLIPS] was shot in the head and
died.  He was shot in the 2200 block of Savannah Terrace, S.E.,
WDC.  CARLOS has a brother named LAMONT who is incarcerated.  At
the time of his death, CARLOS was driving a burgundy Buick
Riviera which was registered to his mother.

DARNELL JACKSON, aka "FATS," is the owner of the
Senate Inn Sports Bar, located at 5000 Marlboro Pike, Capitol
Heights, Maryland.  On the evening of November 27, 2005, JACKSON
was hosting a party at his club for teenagers aged 15 to 18.
During the party, one of the male teenagers was shot in the leg.

FRANK RAWLINGS was arrested in mid-November of this
year.  ████████ initially heard RAWLINGS was arrested in
possession of marijuana and a gun.  However, ████████ spoke to
RAWLINGS after he was released from prison, and RAWLINGS said he
was arrested for Assault.  While he was in the D.C. Jail,
RAWLINGS spoke with several of the incarcerated conspirators in
the ANTOINE JONES narcotics investigation conducted by the FBI.
Those persons told RAWLINGS that they had obtained paperwork on
their case which made them believe that KIRK CARTER had also
been charged in the same conspiracy.  They believed that CARTER
was incarcerated on that charge for only a day or two, and must
be back out on the street because he was "snitching."  RAWLINGS
is doing everything he can to spread the word about CARTER in
the hope that someone will kill CARTER.

████████ knows KIRK CARTER is currently using cellular
telephone number 202-437-0047.  CARTER is associated with DARRYL
BLAYLOCK, aka "MOOKIE."  BLAYLOCK has recently used telephone
number 301-741-2146.  BLAYLOCK has a brother who is nicknamed
"POOKIE."  One of POOKIE's associates is (FNU) HENSON.

████████ previously provided information regarding a
major distributor of PCP in WDC named ERIC (LNU).  ERIC is
currently using cellular telephone number 202-725-3384.

---

Investigation on    11/30/05    at  Washington, D.C.

File #  245F-WF-227911 SUB 302                    Date dictated

by    SA Timothy J. Ervin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

(EXHIBIT 4)

**VOLUNTARY STATEMENT**
(WITNESS)

Antoine Jones

I, Beverly Johnson, voluntarily give this statement without threat, promise or coercion. The events contained herein are true and correct to the best of my knowledge and belief. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.

I am 41 years of age, and I permanently reside at 1918 Village Green Dr. Hyattville
My res. address is SAME for the period of 2 yrs.

I got a call from Antoine from the jail. Antoine asked me if Donald Hunter is O.K. and where he was. I told him I'd try to find out. Antoine and I were introduced by Donald Hunter and were mutual friends. Antoine also asked if I knew Kevin Ray AKA Bald Head, and I said I do know him. About a week later I wrote Antoine a letter. In the letter I told Antoine that Donald Hunter was in the jail and he was O.K. I also told Antoine that Kevin Ray was not. That the word in the barbershop was that Kevin Ray was talking. I also wrote that I loved him, and that I'd be writing soon.

I have read each page of this statement consisting of ____1____ page(s), written by me (for me) each page of which bears my signature, and corrections, if any, bear my initials.

Dated at ___3:15 pm___ , this 24 day of April 19 2006

A63

**VOLUNTARY STATEMENT**
**(WITNESS)**

*Antoine Jones*

I, _Deborah O'Neal_, voluntarily give this statement without threat, promise or coercion. The events contained herein are true and correct to the best of my knowledge and belief. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.

I am _44_ years of age, and I permanently reside at _3904 Eldbridge terr Bowie MD_
My resort address is _SAME_ for the period of _1 year_

Antoine called me one day and said he may send me some letters with someone else's name on them, to hold the letters or give them to Lawrance or Lawrance would get them. He never said give a letter to someone or do this or do that. Shortly after the conversation I got a letter addressed to me with Bryant's name on it. Also included was Bryants phone number. I called Bryant and he met me and picked up the letter. I never got any other letters addressed to anyone else or to hold for anyone. None of the letters Antoine sent me contained any threats. I never known Antoine to threaten anyone. I never opened or Read the letter addressed to Bryant, and that letter had Bryants name on it.

I have read each page of this statement consisting of _____ page(s), written by me (for me) each page of which bears my signature, and corrections, if any, bear my initials.

Dated at _12:30 pm_, this _12_ day of _April_ _2006_

WITNESS:

**A155**

(2 J 1515+ # 12)

**VOLUNTARY STATEMENT**
(WITNESS)

*Antoine Jones*

I, Brian Waddell , voluntarily give this statement without threat, promise or coercion. The events contained herein are true and correct to the best of my knowledge and belief. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.

I am 48 years of age, and I permanently reside at 3920 Brooklyn Ave brooklyn MD
My report address is SAME for the period of 2 yrs

At the end of November 2005 I got a call from a woman named Deborah. Deborah said that Antoine sent her a letter for me. I went to Bowie town center and meet with Deborah and got the letter. The Envolope had Deborahs name on the front and my name on the back. The letter explained that the police arrested Antoine, they got some money out of his Jeep, the police went in his house and didn't find anything. He needed money for his defense lawyer, wanted me to check with the club promoters, Bo and Ivey, to see if they wanted to take over the club, he was saying that guys were out of jobs from the club, and to tell my family hello. The letter never contained any threats. Antoine never sent me any letters to give to anyone else, or to hold for someone to pick up.

I have read each page of this statement consisting of 1 page(s), written by me (for me) each page of which bears my signature, and corrections, if any, bear my initials.

Dated at 6:30 pm , this 18 day of April 2006

WITNESS:

A154

(Exhibit 7 #18)

July 26 2005

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
                               :
    v.                          :     Criminal No. 05-386(1) (ESH)
                               :
ANTOINE JONES               :

### DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE
### FROM  DEFENDANT'S JAIL CELL

Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and

pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby

respectfully moves to suppress tangible evidence seized from Jones' jail cell by law enforcement

agents.  In support of this Motion, Jones states as follows:

### FACTS

As the Court is well aware, Jones was initially charged in a Superseding

Indictment with Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or

More of Cocaine and Fifty Grams or More of Cocaine Base (Count 1); Unlawful Possession with

Intent to Distribute 50 Grams or More of Cocaine Base (Count 2); Unlawful Possession with

Intent to Distribute Cocaine and Aiding and Abetting (Count 3); and Use of a Communication

Facility to Facilitate a Drug Trafficking Offense (Counts 5 -34).  The government's general

allegation is that Jones was part of a narcotics conspiracy from at least 2003 until October 24,

2005, which spanned from the District of Columbia, Maryland, Texas, North Carolina and

elsewhere.  In particular, the government alleges that Jones was the primary supplier of cocaine

to members of the organization in the District of Columbia and Maryland.

After his arrest on October 24, 2005, Jones was presented before Magistrate

Judge Robinson, who ordered him held without bond pending trial.  On November 22, 2005,

*From Defendants motion To suppress Tangible*

The government may also argue that it had source information that Jones, through communications from his cell, was attempting to tamper with witnesses. For example, via letter dated December 5, 2005, AUSA Lieber informed counsel that

> As I mentioned, in early November, we received information through various channels, including from agents wholly unrelated to this investigation, that [Jones] was attempting to identify witnesses against him and 'take care of them.' Based on this information, we obtained copies of all calls your client made from the D.C. Jail.[1] Then, based on some of the discussions he was having with individuals in the community, in conjunction with this source information, we obtained a search warrant for your client's cell . . . .

(See Exh. 2 at 2). Although the government may have had this source information about Jones' alleged attempts to locate or intimidate witnesses, Horne failed to include this information on the Affidavit.

On the facts of this case, the underlying affidavit is entirely lacking in indicia of probable cause. *Leon* clearly and unequivocally states that when the affidavit itself is entirely lacking in indicia of probable cause, it cannot be said that the officer acted in good faith in relying on a warrant that issues. That is the precise situation we have in this case.

"All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde,* 440 F.3d 1065, 1067 (9th Cir.2006) (en banc) (quoting *United States v. Anderson,* 453 F.2d 174, 175 (9th Cir.1971) (internal quotation marks omitted)). Where the affidavit itself lacks *all* indicia of probable cause, it would unduly undermine the foregoing rule to permit extrinsic indicia of probable cause to be presented through an unsworn, unrecorded oral colloquy. Related to the foregoing, the Constitution also requires that probable cause be established "by Oath or affirmation." If unsworn, unrecorded oral colloquies, which may not be

---

[1] Jones also moves to suppress these calls because, upon information and belief, the government did not obtain these calls pursuant to a lawfully authorized subpoena or warrant.

*Very Important*

6

*Prosecutorial misconduct*

(EXHIBIT #8)

As to the first point – evidence of a prior active drug conspiracy involving Maynard and Jones – the affidavit laid out information supplied by informants detailing Maynard's role as trusted lieutenant and drug courier for Jones (affidavit at 5-7); the stop of Maynard in North Carolina with over $67,000, concealed in a hidden compartment in Jones's mini-van, along with pen register activity contemporaneous with the stop linking Maynard to Jones's possible drug sources (affidavit at 7-9); wire intercepts confirming Maynard's role as Jones's confidant in the drug business (affidavit at 9-11); and the major seizures of drugs and money on October 24, 2005, confirming the extent of the drug activity (affidavit at 11).   This left little question that if Jones trusted anyone in his drug organization, it was Maynard.

As to the second point – ongoing activity – the affidavit laid out a number of phone calls Jones had made while incarcerated at the D.C. Jail.[7]  In several to Deborah O'Neal, a romantic interest,  Jones indicated that he was sending her letters addressed to others, which she was supposed to give to "Lawrence" because he would know what to do with them (affidavit at 12). Jones told O'Neal to urge Maynard to visit Jones in the jail so he would not "be in the blind" (affidavit at 12).  In conversations with his wife, Jones also asked  her to contact Maynard for him and urged her to have Maynard visit him at the jail (affidavit at 12).

---

[7]       Jones, in a footnote to his motion, without any supporting authority, suggests that these conversations should be suppressed because they were not obtained with a subpoena or warrant.  Def. Mot. at 371 n.1.  The conversations at issue are recordings made by the jail of conversations on phones used by prisoners kept in the hands of jail officials as part of a public policy of monitoring inmate calls, including signs above the phones indicating that they may be recorded.  It is difficult to understand how Jones could have any protected Fourth Amendment interest in these recordings and Title III specifically excludes this kind of monitoring from its coverage.  Smith v. Department of Justice, 251 F.3d 1047, 1049 (D.C. Cir. 2001).

17

93

its own witnesses).    In any event, Jones has not shown any
prejudice resulting from the allegedly improper subpoenas.    See
Bank of Nova Scotia v. United States, 487 U.S. 250, 254, 256 (1988)
("as a general matter, a district court may not dismiss an
indictment for errors in grand jury proceedings unless such errors
prejudiced the defendants").

     Jones also complains that prosecutors sent a memorandum to the
D.C. Jail resulting in his placement "in segregation" (Jones's
Brief at 20).    This allegation is unexplained.[66]    In any event,
Jones's misconduct allegations, even if true, did not warrant
dismissal of the indictment.    See Rochin v. California, 342 U.S. at
172.

     5.    Venue

     To the extent Jones is challenging venue (Jones's Brief at
22), his challenge is frivolous.    "It is a well-established rule
that 'a conspiracy prosecution may be brought in any district in
which some overt act in furtherance of the conspiracy was committed

---

     [66]    Jones also argues, without support, that it was misconduct
for officials to "listen[] to Appell[ant's] DC Jail calls without
a court order" (Jones's Brief at 20).    On the contrary, recording
federal inmate phone conversations does not violate the Fourth
Amendment because inmates have both actual and constructive notice
of the monitoring of their conversations.    United States v. Amen,
831 F.2d 373, 379-80 (2d Cir. 1987).    Moreover, Title III excludes
such monitoring from its coverage.    Smith v. Department of Justice,
251 F.3d 1047, 1049 (D.C. Cir. 2001).



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Statement

| | |
|---|---|
| OPI: | PROG |
| Number: | 4070.1B |
| Date: | April 30, 2007 |
| Supersedes: | 4070.1A (4/8/94) |
| Subject: | Inmate Telephone Access |

1. **PURPOSE AND SCOPE.** To establish guidelines governing inmate telephone access.

2. **PCLICY.** It is the policy of the DC Department of Corrections (DOC) to ensure that all inmates housed at the Central Detention Facility (CDF) have reasonable and equitable access to telephones for authorized purposes.

3. **PROGRAM OBJECTIVES.** The expected results of this directive are:

   a. Inmates shall be afforded the opportunity to maintain family and community ties consistent with safety and security requirements of the CDF and the community.

   b. Inmates who are not indigent shall be responsible for the expense of telephone use.

   c. Inmate telephone use shall be monitored in order to preserve the safety, security and orderly operation of the CDF and to protect the general public.

4. **APPLICABILITY.** This policy shall apply to DOC inmates, employees, contractors, volunteers, interns and any others who provide services and conduct business within the DOC.

5. **NOTICE OF NON-DISCRIMINATION**

   a. In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code §2.1401.01 et seq., (Act) the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, or place of residence or business. Sexual harassment is a form of sex discrimination that is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.

    6)    If the inmate was unable to make contact to the attorney or their representative;

    7)    Name and signature of the staff member and inmate placing the call.

  e.    If a staff member other than the inmate's Case Manager places the call, he/she must forward a copy of the log entry to the Case Manager to be placed in the inmate's case file.

  f.    Legal calls shall be made from a private area where there is limited access for others to overhear the conversation.

## 12. TELECOMMUNICATION DEVICE FOR THE DEAF (TDD)

  a.    TDD's shall be provided for inmates who are deaf or hard of hearing in a manner that ensures effective access to telephone services.

  b.    Telecommunications Typewriters (TTY) shall be provided for inmates to communicate with family members or friends who are deaf or hard of hearing.

  c.    ITS telephones equipped with volume control mechanisms shall be dispersed among the ITS telephones throughout CDF. Appropriate signage shall be visible to identify a volume control telephone.

## 13. MONITORING AND RECORDING INMATE TELEPHONES

  a.    The audio and call data for all calls made from ITS telephones will be recorded.

  b.    Calls made from the ITS telephones may be monitored live.

  c.    Call data from the ITS may be analyzed.

  d.    Recorded ITS telephone calls may be reviewed.

  e.    Call data records and recordings of inmate telephone calls are considered sensitive and shall not be released without a subpoena or other appropriate legal order.

## 14. PROCUREMENT OF INMATE TELEPHONE SERVICES

  a.    Contracts for inmate telephone service must comply with all federal and District of Columbia laws and regulations.

  b.    Requests for proposals shall require vendors to provide rates that are similar to those charged in the community and to justify any rates or surcharges higher than ordinary commercial rates. Rates should be based on the broadest possible range of calling options.

Devon Brown
Director

(대한민국대회)

AVAILABLE AT PUBLIC TERMINAL FOR VIEWING ONLY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------X

THE UNITED STATES OF AMERICA          Criminal Case No.

              v.                     05-386

ANTOINE JONES, et al,                 REDACTED

           Defendants,
-------------------------------X      Washington, D.C.
                                      March 24, 2006
                                      11:30 A.M.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Government: JACK GEISE, ESQUIRE
                  RACHEL LIEBER, ESQUIRE
                  Office of the U.S. Attorney
                  555 4TH Street, N.W.
                  Washington, D.C.  20560
                  (202) 616-9156


For Defendant Jones: EDUARDO BALAREZO, ESQUIRE
                  400 Fifth Street, N.W.
                      Suite 500
                    Washington, D.C.  20001
                    (202) 639-0999


Court Reporter:              Lisa Walker Griffith, RPR
                        U.S. District Courthouse
                        Room 6507
                        Washington, D.C.  20001
                      (202) 354-3247


Proceedings recorded by mechanical stenography,

transcript produced by computer.

(Exhibit #13)

of Columbia, Possession of an Unregistered Firearm and Possession with Intent to Distribute Cocaine, dismissed.

(b) **LAWRENCE MAYNARD** is a black male, born on August 21, 1961. He is described as approximately 6'2" tall and 240 pounds, with a Social Security Number of ███ ███. **MAYNARD** resides at 7711 Greanleaf Road, Hyattsville, Maryland. A search of FBI criminal history records for **MAYNARD** (FBI #512598TA1) revealed the following: 1993, District of Columbia, Distribution of Cocaine, found not guilty.

*Delete*

(c) **NICHOLAS JONES, a/k/a "TOBY"** is a black male, born on July 3, 1964. He is described as approximately 6'0" tall and 205 pounds, with a Social Security Number of ███ **JONES** resides at 563 23rd Place, N.E., Washington, D.C. A search of FBI criminal history records for **JONES** (FBI#899882DA1) revealed the following: 1985, District of Columbia, Carrying a Pistol without a License, Possession with Intent to Distribute Cocaine, Receiving Stolen Property, dismissed; 1985, District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to Possession of Cocaine, sentenced to one year probation; 1987, Hyattsville, Maryland, Distribution of Controlled Dangerous Substance Cocaine, dismissed; 1987, Baltimore, Maryland, Possession with Intent to Distribute Cocaine, guilty, sentenced to five years' imprisonment, with all but one year suspended; 1991, District of Columbia, Distribution of Heroin, guilty, sentenced to 7-21 years' imprisonment; 2003, District of Columbia, Simple Assault, dismissed.

(d) **ANTHONY LAMONT KOONCE, a/k/a "TONY, " a/k/a LAMONT,** is described as a black male, born March 27, 1972. He is approximately 5'8" tall and 165 pounds, with a Social Security Number of ███ **KOONCE** resides at 1459 Ridge Place, S.E. Washington, D.C., with a second address of 2006 38th Street, S.E. #202, Washington, D.C., but is presently a resident

*Delete*
*Transed in wini Top Apperssvid I spoke of.*

8

*Delete*

of a District of Columbia halfway house, as he awaits trial on narcotics trafficking charges in United

States District Court for the District of Columbia.  A search of FBI criminal history records for

*Delete*

**KOONCE** (FBI# 331562MA3) revealed the following criminal history: 1990, Washington, D.C.,

Controlled Substances Act Violation, Cocaine, dismissed; 1991, District of Columbia, Fugitive from

Justice, dismissed; 1991, District of Columbia, Carrying a Pistol without a License, dismissed; 1991,

District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to Attempted

Possession with Intent to Distribute Cocaine, sentenced to two years' probation, revoked in 1993,

sentenced to 15-45 months' incarceration; 1993, District of Columbia, Possession of PCP, guilty,

sentenced to 60 days' incarceration; 1995, District of Columbia, Escape from Institution, guilty,

sentenced to 4-12 months' incarceration; 2002, District of Columbia, Assault with a Dangerous

Weapon, Bat, dismissed; 2002, District of Columbia, Simple Assault, dismissed; 2003, District of

Columbia, Simple Assault, dismissed; 2005, District of Columbia, Simple Assault, dismissed; 2005,

District of Columbia, Possession with Intent to Distribute Five Grams or More of Cocaine Base,

Possession with Intent to Distribute Heroin, Possession of Marijuana, currently pending in the United

States District Court for the District of Columbia.    *Delete*

(e) **DERRICK GORDON** is a black male born on April 10, 1977.  He is described as

approximately 5'8" tall and 150 pounds, with a Social Security Number of ███████. **GORDON**

resides at 4748 Benning Road, S.E., Apartment 202, Washington, D.C.  A search of FBI criminal

history records for **GORDON** (FBI# 528127EB5) revealed the following criminal history:  1987,

District of Columbia, Possession with Intent to Distribute Marijuana, Possession of an Unregistered

Firearm, Unlawful Possession of Ammunition, dismissed; 1997, District of Columbia, Possession

of Marijuana, dismissed; 1997, District of Columbia, Possession with Intent to Distribute Marijuana,

dismissed; 1997, District of Columbia, Possession of Marijuana, dismissed; 1999, District of Columbia, Unauthorized Use of a Motor Vehicle, Driver, dismissed.

*Delete*

(f) **BRADFORD WADDELL** is a black male born on March 8, 1964. He is described as approximately 5'9" tall and 195 pounds, with a Social Security Number of ▇▇▇▇. **WADDELL** is believed to reside at 3920 Brooklyn Drive, Baltimore, Maryland. A search of FBI criminal history records for **WADDELL** (FBI# 549643CA1) revealed the following criminal history: 1984, District of Columbia, Unlawful Possession of Ammunition, Possession of PCP, dismissed; 1985, District of Columbia, Possession with Intent to Distribute PCP, pleaded guilty to Possession of PCP, sentenced to three years' probation; 1998, Anne Arundel County, Maryland, Second Degree Assault, Resisting Arrest, plead guilty to Disorderly Conduct in Public, sentenced to 60 days' incarceration, suspended, with nine months' probation; 1995, Prince Georges County, Maryland, 4th Degree Burglary, dismissed; 1995, Prince Georges County, Maryland, Disorderly Conduct and Resisting Arrest, dismissed; 1985, Charles County, Maryland, Possession of Controlled Dangerous Substance, PCP, with Intent to Distribute, Possession CDS Marijuana, with Intent to Distribute, Possession CDS Cocaine, with Intent to Distribute, pled guilty to Possession CDS PCP with Intent to Distribute, and sentenced to three years' incarceration.

*Delete*

(g) **ANNETTE BIGESBY** is a black female born on February 11, 1962. She is described as approximately 5'4" tall and 155 pounds, with a Social Security Number of ▇▇▇▇. **BIGESBY** resides at 11018 Spring Lake Drive, Mitchellville, Maryland. A search of FBI criminal history records for **BIGESBY** (FBI#895031V9) revealed the following: 1982, District of Columbia, Robbery, dismissed; 1992, District of Columbia, Possession with Intent to Distribute Marijuana and Possession with Intent to Distribute Heroin, dismissed; 1983, District of Columbia, Robbery (Two

10

counts), pled guilty to Attempted Robbery, sentenced to two-six years' incarceration; 1985, District of Columbia, Petit Larceny, guilty, sentenced to one year of incarceration, suspended, four years' probation, probation revoked, 1987; 1986, District of Columbia, Armed Robbery, dismissed; 1987, District of Columbia, Attempted Distribution of Marijuana, guilty, sentenced to one year of incarceration, suspended, 12 months probation; 1987, District of Columbia, Bail Reform Act violation, guilty, 12 months' probation; 1987, District of Columbia, Shoplifting, guilty, sentenced to 20 days' incarceration; 1988, District of Columbia, Attempted Possession of Cocaine, guilty, sentenced to 120 days' incarceration, suspended, two years' probation, probation revoked 1989; 1990, District of Columbia, Distribution of Cocaine, Guilty, sentenced to three-nine years' incarceration, suspended, two years' probation; 1990, District of Columbia, Distribution of Cocaine, dismissed; 1997, District of Columbia, Simple Assault, dismissed; 2004, District of Columbia, Possession with Intent to Distribute Heroin, dismissed; 1995, Prince Georges County, Maryland, Battery (Deadly Weapon), dismissed; 1986, Prince Georges County, Maryland, Theft (misdemeanor), guilty; sentence not recorded; 1987, Maryland, Shoplifting, guilty, sentenced to one month of incarceration; 1985, Alexandria, Virginia, Concealment (misdemeanor), guilty, sentence not recorded; 1986, Arlington, Virginia, Shoplifting, guilty, sentenced to one week of incarceration; 1999, Ohio, Conveyance of Weapons and Attempted Drug Abuse, guilty, sentenced to 180 days' incarceration, suspended all but 30 days, with one year of probation.

(h) **DONALD ADRIAN HUNTER a/k/a TERRY SAMUEL**, is a black male born on August 9, 1964. He is described as approximately 5'11' tall, weighing approximately 165 pounds with a Social Security Number ███████. **HUNTER** is believed to reside at 3202 Curtis Drive, Apartment # 708, Temple Hills, Maryland. A search of FBI criminal history records for **HUNTER**

11

(FBI# 347990CA2) revealed the following criminal history: 1984, District of Columbia, Taking Property Without Right, Second Degree Theft, dismissed; 1987, District of Columbia, Attempted Distribution of Cocaine, sentenced to 20 months to five years of incarceration, execution of sentence suspended; 1987, District of Columbia, Possession of Cocaine, sentenced to 14 days' incarceration, 1987, District of Columbia, Simple Assault, found not guilty; 1990, District of Columbia, United States District Court, pled guilty to Conspiracy to Possess with Intent to Distribute Cocaine, sentenced to 121 months' incarceration, eight years' supervised release; and Assault with a Deadly Weapon, sentenced to 120 months' incarcerations and eight years' supervised release; supervised release revoked 2000, sentenced to 18 months' incarceration; 2000, District of Columbia, Robbery, Possession of a Firearm During a Crime of Violence, dismissed, 2001; Prince George's County, Possession With Intent to Distribute a Controlled Substance, dismissed; 2002, District of Columbia, Disorderly Conduct, dismissed, Reckless Driving, sentenced to three months' incarceration, Violating a Drug Free Zone, dismissed; 2005, District of Columbia Superior Court, Possession with Intent to Distribute Heroin, currently pending.

(i) **ADRIAN JACKSON** is a black male, born July 11, 1978. He is described as 5'8" tall and 185 pounds, with a Social Security Number of ██████. JACKSON is believed to reside at 2627 Bowen Road, S.E., Apartment 102, Washington, D.C. A search of FBI criminal history records for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in 2004; in addition, he has a pending case for Carrying a Pistol without a License in the District of Columbia, for which he was indicted in December, 2004. Delete

12

Delete

(j) **DIANE BUSHROD, a/k/a, DIANE SMITH** is a black female, believed to be born on February 25, 1960, with a second listed date of birth of February 25, 1962. She is described as 5'9" and tall 250 pounds, with a Social Security Number of ██████. **BUSHROD** is believed to reside at 3430 21ˢᵗ Street, S.E., Washington, D.C., but the address listed on her driver's license is 3103 Sherman Avenue, N.W., Washington, D.C. A search of FBI criminal history records for **BUSHROD** (FBI# 379746CA3) revealed that she has arrests for narcotics violations, and that her most recent conviction is for Attempted Distribution of Marijuana in 1988. Delete

(k) **TERRENCE DIXON a/k/a NIMROD BABYLON**, is a black male born on January 16, 1979. He is described as 5'8" tall and 120 pounds, and uses Social Security Numbers ██████ ██████. **DIXON** is believed to reside at 1220 North Scott Street, apartment 202, Arlington, Virginia. A search of FBI criminal history records for **DIXON** (FBI # 872752DB8) revealed that he has arrests for sexual assault, kidnaping and weapons offenses. In January 1999, he was convicted in the District of Columbia of Possession with Intent to Distribute Cocaine While Armed, Carrying a Pistol Without a License, and Unlawful Possession of Ammunition for which he was sentenced to terms of incarceration of three to nine years, 20 to 60 months and one year respectively.

(l) **KIRK R. CARTER** is a black male born on April 9, 1963. He is described as 5'8" tall and 160 pounds, and uses Social Security Number ██████. **CARTER** is believed to reside at 2504 Pomeroy Road, S.E., Apartment 402, Washington, D.C. A search of FBI criminal history records (FBI# 362520DA9) revealed that **CARTER** has a 1990 conviction in United States District Court for the District of Columbia for Conspiracy to Distribute Cocaine, for which he was sentenced to a term of incarceration of 135 months. He also has two other federal court narcotics trafficking

cases, which appear to have been consolidated with the 1990 Conspiracy case. In addition, he has a 2004, Possession of Marijuana case, for which he was given Diversion, in lieu of a criminal conviction.

(m) **TWANDA CAMPBELL** is a female born on January 27, 1967, with a Social Security Number of ███████. She is believed to reside at 5412 D Street, S.E., Washington, D.C., although the cellular telephone subscribed to in her name lists an address of 3920 Brooklyn Avenue, Baltimore, Maryland. Investigation revealed no additional information regarding **CAMPBELL**.

(n) **DAMIEN LOMERT BROUSSARD**, is a black male born on February 15, 1975. He is described as 6 feet tall and 145 pounds, with a Social Security Number of ███████, and additional Social Security Numbers of ████████████. **BROUSSARD**'s address is unknown at this time, and his last-known mailing address is P.O. Box 16927, Lake Charles, Louisiana.[1] A search of FBI criminal history records (FBI# 485536RA9) revealed that **BROUSSARD** has had at least seven arrests for Cocaine and Marijuana Distribution, and related offenses, in Lake Charles, Louisiana, dating back to 1992, with at least one conviction for Felony Possession of Cocaine, for which he is on probation until 2008.

(o) **TYMIRA HUNTER** is a black female, born on February 19, 1973. She is described as 5'3" tall and 137 pounds, with a Social Security Number of ███████ **HUNTER** is believed to reside at 1238 D Street, N.E., Washington, D.C. A search of FBI criminal history records (FBI#

---

[1]    **BROUSSARD** has a relative named **QUENTESA BROUSSARD**, who resides at 432 Longfellow Street, N.W., Washington, D.C. As set forth more fully *infra*, investigators believe that **DAMIEN BROUSSARD** is using a cellular telephone in the name of **QUENTESA BROUSSARD**, to engage in narcotics-trafficking activity with **ANTOINE JONES**.

[2]    At this time, investigators know of no relationship between **TYMIRA HUNTER** and **DONALD HUNTER**, a/k/a **TERRY SAMUEL**.

14

USCA Case #11-5191    Document #1407743    Filed: 11/30/2012    Page 47 of 80

Case 1:05-cr-00386-ESH   Document 93-1   Filed 03/23/06   Page 4 of 5





B-2

mental notes for lawyer
and phone list

(Exhibit #14)

Hey
It's me Beverly. Miss You. I
guess things didn't work out like
I wanted them too. I receive your
letter Tuesday 8th. I waited all
night hoping you where going to knock
on my door Wedsenday night. But
coming home thursday after seven
and see that you call, I know you
didn't make it home. I miss you.
Right now I'm crying because I'm
going through a little stress. And
my son is not making it any better
With getting in trouble with the
Police. I already have one son in
jail and keep telling him, it's not
a good place to be.

I wish you where here holding
me, just holding me close to you, oh
I miss you! You must thuck I crazy
keep saying I miss you, but I do.
Could you tell me what's going on,
I wanted to come to court but
I know your wife was going
to be there and I did not

**A185**

wanted to look strange. But
I care!. I see you calling me
but a good time to call is after
seven P.m. Monday thur Saturday
and starting December after 8:00
PM because of X-mas. You Know
my job its finish until all the
mail is deliver.

The information on Donald
Hunter. He is in NB 2. yes he's
over there and Kevin Rey is
bald head and he's on the
street last they Know. Something
else. I remember when he had
a big case and they or the
word was going around that
he's been snitching because
he seem to come home on them
Now I'm sitting here hoping
you call before your phone
time is up



Take Care
Because I Care
Beverly

(EXHIBIT #18)   Personal Letter

Hi Neicey

You won't be suffering in I can help it. There's alot of things that could have been done in our case that wasn't and for that we did lots of time, but not in this case because I'm going to make sure he stays on top of every thing so he can beat it way before a trial or plea. You're a good woman I take that back your a Super great woman and there won't be tears in your eyes for long.

Here's whats going on. I've sent Toine another letter detailing the motions that needs to be filed right away within the 2-4 weeks of anyones arrest. These motions will tell him what evidence they have and plan to use, who the government witness are and what they said, how they came to the conclusion of him being involved in anything, the level and strength of what they have, who his co-defendents, and co-conspirators, and everything pretaining to his case per say. Also I placed a motion and court order so that he now have the maximum time allowed in the law library per wk. to better understand the legal aspect of the case. There's also the bond motion which he needs to renew each month.

Now what helps him in the bond motion is letters from people who know him as to living in the metropaliton area, saying he's been a resident for years and never pose a threat, anybody that has a business or business letter head is even better. These letters should be affidavits which is more recognized than anything.

Now the motion and court order for the Law Library should be type if you can and send him 3 copies of the order 3 copies of Motion this way he will have enough in case he can't get to the library for copys

These other motions This listing are what the lawyer needs to file right away and he knows this he should if he's a serious lawyer Antoine needs to file them if the lawyer does not and he need to make sure they're file. To do this he only needs to write the Clerks Office Criminal Division at the court and request a copy of the Criminal Docket in his case.

Here are the motions the lawyer needs to file or Antoine should file.

(1) Motion for Disclosure of similar Act or Evidence

(2) Motion for Disclosure of Exculpatory Evidence

(3) Motion for Bill of Particulars

(4) Motion to Compel Discovery

(5) Motion for Pretrial Determination of Admissibility of co-conspirators statements pursuant to FRE 801 (d) (2) (E)

(6) Motion for review and revocation of detention order (if a certain one was placed on him no bond) this is where the affidavits will come into place in helping his credibility to make bond

Neicey I'm sorry that I can't do the things I want, being in lock'down doesn't allow me much assest to what I need but I'el give you what I already know okay. Be strong Neicey, it's the beginning and if things are done right he should be out before a trial can start. By the way did they leave a copy of the search or arrest warrant with you which was it and did the search thd place. Know that you and Lil Antoine are loved!    love R. S. M.

( Exhibit 5 )

AVAILABLE AT PUBLIC TERMINAL FOR VIEWING ONLY

Ned unredacted[11]

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25              (Open Court)
```

( ξ. (l)(l)(l)(l)) (l)(l) Σ )

AVAILABLE AT PUBLIC TERMINAL FOR VIEWING ONLY

```
1                 P R O C E E D I N G S

2            THE COURTROOM DEPUTY: Criminal case

3    05-386-1.   United States of America versus Antoine

4    Jones.   John Geise for the United States.   Eduardo

5    Balarezo for the defendant.

6            MR. GEISE:   Your Honor, we call Detective—

7            MR. BALAREZO:   Your Honor, before the

8    detective takes the stand, could we approach?

9            (The following bench conference was sealed

10   and deleted by Order of the Court.)

11

12

13

14

15

16

17

18          need unredacted

19

20

21

22

23

24

25
```

*Interview of Deborah O'Neal by Government*

On Thursday, January 26, 2006 I went to what I thought was going to be my appearing before the grand jury, but instead, I met with Rachel Lieber, Stephanie Yunta and Steve (don't know his last name...short stocky white male) and another agent (don't know her name...tall black female who came in towards the end of this meeting). We met in one of the witness rooms outside the grand jury hearing room. I got there around 1:05 p.m., for again, what I thought was a 1:30 p.m. appearance before the grand jury with no plans to meet with Ms. Lieber, but after said that she along with the agents wanted to talk to me before going into the grand jury, I agreed.

Stephanie asked me for my personal information (name, address, telephone number and occupation) which she and Ms. Lieber proceeded to write down along with everything else that I said. Ms. Lieber then said that I was there to testify before the grand jury and asked me if I knew what that entailed and my response was "not exactly". She went on to say that I would be asked questions regarding their investigation of Antoine Jones and that I was expected to tell the truth and if not it would result in me perjuring myself and lead to charges being brought against me. After her explanation of the grand jury process the conversation proceeded as follows:

Lieber:  We have listened to a lot of phone conversations between you and Antoine and from those conversations it is clear that the two of you are romantically involved, but we are not here to judge you for that and we don't care about that. We want you to know that whatever is said in this room or before the grand jury is secret and will never disclosed to anyone. We will never tell anyone, but if you choose to tell someone that's your business, but we won't.
Lieber:  Are you and Antoine romantically involved?
Answer:  Yes.
Lieber: Where did you meet him?
Answer: We worked togther.
Lieber: Where?
Answer: P.G. Sports & Learning Complex.
Lieber: Where is that located?
Answer: Landover.
Lieber: How long have you known him?
Answer: Four years.
Lieber: How long after you met him did you become involved?
Answer: About one year.
Lieber: How did you find out about all of this and him being arrested?
Answer: On the news and in the newspaper.
Lieber: Did he tell you to send him all the articles from the paper and the internet because they didn't have the same thing that the paper was saying?
Answer: He did ask me to send him the newpaper articles, but I don't know what you mean when you say that he said they didn't have the same thing that the paper had?
Lieber: What did you send him?
Answer: The article from the paper and two other articles from the internet.
Lieber: Were you supposed to meet him the night before he was arrested?
Answer: No and I don't even know when he was arrested. When was he arrested?
Lieber: On Monday morning, October 25. Didn't you talk to him the night before he was arrested and was supposed to meet him?

RESPECTFULLY SUBMITTED

Antoine Jones
ANTOINE JONES
JANUARY 7, 2008

Laurence Maynard
LAURENCE MAYNARD
JANUARY 7, 2008

Answer: Yes, I did talk with him on Sunday night for a few minutes and he then asked me if I had company and I said yes and he said okay, I will talk to you tomorrow and we hung up. I called him back later and talked to him briefly, but I wasn't supposed to meet him.

Lieber: He went out of town the week-end before he was arrested, where did he go?

Answer: Church.

Lieber: He went out of town to church?

Answer: Yes, he and his family attended church out of town.

Lieber: Nov. 3, which is the first call that Antoine made to you from jail...after you found out that he was alright and you went through the I miss you and things like that, why didn't you ask him what the hell was going on?

Answer: I don't know.

Lieber: I am having a hard time believing that your boyfriend that you love so much and believe is this great guy could be the leader of a drug ring that got caught with almost a million dollars, 100 kilograms of cocaine, guns and go to jail and you not act any different than you did, unless you knew what was going on. Again, since this was your boyfriend, we just couldn't figure out why you didn't respond as shocked, upset, angry or anything like that. This was the largest amount of cocaine seized in D.C. history and in the paper his name was listed first as the leader.

Answer: Again, I don't know. My response was what it was and I can't give an answer as to why it wasn't what you thought it should have been.

Lieber: Well, here is an example, we listened to another one of his calls with a female caller who said that she was shocked as ever and almost fell off her chair when she heard about this and we can't figure out why your response wasn't the same or somewhat similar to hers?

Answer: Again, what do you want me to say...I can't tell you why my response wasn't like that of someone else. I felt that if he wanted to tell me what was going on and why he was in jail, he would. I am not one to pry into other people's business.

Question: You mean that you had no idea that he was a drug dealer and that he was hanging out with all these Mexicans?

Answer: No, I didn't and I still don't. Can I just say something here? I have no knowledge of what it is that you are accusing him of and it looks as if the only way that you are going to believe me is if I say what it is that you want to hear and I won't do that because then I would be lying. I thought that a person was innocent until proven guilty anyway.

Lieber: Yeah, that's true.

Lieber: On another call (Nov. 6) that he made to you from jail, he told you that if any letters came to your house from him with someone else's name on it, you should hold it for Lawrence and he would get them from you.

Answer: That's not true. He never told me to hold anything for Lawrence.

Lieber: But didn't he did tell you that you might get some letters from him with somebody else's name on it and you said okay fine?

Answer: Yes.

Lieber: Did you ever get any letters addressed to someone else?

Answer: No, they were addressed to me with someone else's name on the back.

Lieber: Who's name was on it?

Answer: Bryant

Lieber: What did you do with it?

Answer: I gave it to Bryant.



Lieber: How did you contact this Bryant?
Answer: I called him?
Lieber: How did you know how to contact him?
Answer: Antoine gave me his phone number.
Lieber: How did he give you his phone number?
Answer: In a letter.
Lieber: What was in the letter with Bryant's name on it and why do you think that he asked you to deliver it?
Answer: I don't know what was in the letter because I didn't open it and I imagine that he asked me to give it to Bryant because he didn't know his address.
Lieber: When did this happen?
Answer: I don't know the date.
Lieber: Where does he live?
Answer: I don't know.
Lieber: Then how did you give it to him?
Answer: I met him on my way home from work one night.
Lieber: Where?
Answer: I had to stop at the drycleaners and he met me there.
Stephanie: What was he driving?
Answer: I don't know.
Stephanie: You mean you didn't see what he was driving?
Answer: I didn't say that I didn't see it, I just don't know what it was....I think it may have been an SUV.
Stephanie: What color was it?
Answer: I don't know, it was dark out and it may have been a dark color.

Ms. Lieber seems to be getting frustrated with me because I am not giving the answers that it appears that she wants and reiterated the consequences of perjury. She again said that she was having a hard time believing what I was saying.

At this time Stephanie pushed in front of me a sheet of paper that she got from Ms. Lieber which had pictures of twelve men on it and asked me if I recognized any of them.

I pointed to Antoine, Lawrence and Adrian. I pointed to someone who I thought might have been John and I said to her "is this John" and she said that they couldn't tell me whether it was or not and I said "it could be...I'm not sure". I did not know any of the other men in the pictures. If I can remember, there were three other black men, four that were some other race and one white.

Steve: Are you referring to John Adams?
Answer: I think that's his name, but I don't really know him like that. I may have seen him a few times at the club and I am not sure that's him.
Lieber: What was the relationship between Antoine, Lawrence, Adrian and John?
Answer: Adrian was co-owner of the club, Lawrence was the manager and John was a bar manager.
Lieber: In another phone call that Antoine made to you from jail, he said that "Mike is in here

crying and his wife is crying". Who is Mike?

Answer: His nephew.

Lieber: No, who is Mike that would be in there crying?

Answer: I think that you misunderstood what he said. I heard him say that "Mike is crying and his wife is crying, but not "Mike is in here crying".

Lieber: Why would he be talking about his nephew?

Answer: I don't know, but his nephew Mike is who he was referring to.

Lieber: What is Mike's last name:

Answer: Jones?

Lieber: So you are saying that you don't know Mike Huggins (sp?)?

Answer: No I don't.

Lieber: In another phone call that he made to you, when he was talking about selling the club to a guy from down near the waterfront, he said that "they tried to time this just right so they could stop the sale of the club?

Answer: I don't recall him saying that.

Lieber: Why did he leave his job at the gym and buy a night club?

Answer: I don't know.

Lieber: Why did he want to sell the club?

Answer: It took up to much of his time.

Lieber: After he sold the club, what was his plans, how was he going to make money?

Answer: I don't know. He did mention that he wanted to get into real estate.

Steve: Who is Derek?

Answer: His nephew.

Steve: What is his last name?

Answer: Jones.

Steve: So you don't know Derek who takes pictures at the club when they had cabarets?

Answer: Oh, okay, I do know him, but not personally. I had seen him at the club on a few occasions.

Steve: In a phone conversation with Antoine, did he tell you to collect some money from Derek?

Answer: No, he didn't.

Steve: Didn't he help you out by giving you some money at times and told you to collect some money from Derek?

Answer: No. Antoine was going to loan me some money, he asked me to call Derek on three way because Derek owed him some money and when Derek finally answered the phone Antoine told him to give me the money that he owed him.

Steve: When and where were you supposed to collect it?

Answer: I wasn't supposed to collect anything and nothing ever came of that phone conversation.

Steve: Did Antoine give you money to help get your car?

Answer: Yes.

Steve: How much did he give you?

Answer: $2,000.

Steve: Did he give you money regularly to help you out with bills?

Answer: No, but there were a few occasions where he loaned me money and I always paid him back.

Steve: When you worked together at the gym, who else worked on the shift with you?

Answer: What do you mean?

Steve: Did any of the other guys work on the shift with the two of you?

Answer: Yes, a shift wasn't just me and Antoine, a shift could be any where from six to ten people depending upon the day or time of day.

Steve: Who were some of the other guys on the shift?

(I didn't get to respond to this question because Ms. Lieber came back in the room and started talking, then after she realized that she had interrupted Steve, she apologized to him and his next question was)

Steve: Didn't your daughter date Adrian?

Answer: No, she never dated him.

Steve: Didn't she date him and know that he was a drug dealer?

Answer: She never dated him and knew nothing about him being a so-called drug dealer.

Lieber: Have you ever seen Antoine with any large sums of money?

Answer: I was with him once when he made a bank deposit of about $5,500 for the club.

Lieber: Was the deposit under $10,000?

Answer: Again, it was about $5,500.

Stephanie: At what bank?

Answer: SunTrust.

Lieber: Did he always carry large sums of money in his pockets?

Answer: I don't know. He sometimes had change for the bar at the club on nights they had events.

Lieber: Was it large bills?

Answer: I don't know.

Lieber: Did he go to the bank everyday?

Answer: I don't know.

Lieber: Did you know that the club was losing money hand over fist and was in big financial trouble?

Answer: No.

Lieber: Did you know that he was trying to sell the club?

Answer: Yes.

Lieber: When was the last big event at the club?

Answer: I don't know, but the last one that I knew of was the football party.

Lieber: Did you run some ads in the paper for the sale of the club?

Answer: Yes.

Lieber: Why did you do it instead of him doing it himself?

Answer: He asked me and I had no problem doing it.

Lieber: When and where was the last time you saw him?

Answer: I visited him the day after Thanksgiving?

Lieber: When was the last time that you talked to him?

Answer: I don't know....just before he couldn't make phone calls any more.

Lieber: How did you know that he couldn't make phone calls any more?

Answer: He told me in a letter.

Lieber: What did he tell you was the reason why he couldn't make calls?

Answer: Because he was in the hole?

Lieber: Did he tell you why he was in the hole?

Answer: No.
Lieber: When was the last time that you received a letter from him?
Answer: Monday or Tuesday.
(I got the feeling that they were surprised that he was getting mail or able to send out mail)

Lieber: Did he know that you had been subpoenaed to appear before the grand jury?
Answer: Yes.
Lieber: How did he find out?
Answer: I told him.
Lieber: How?
Answer: I told him in a letter.
Lieber: Did he tell you to call his lawyer?
Answer: Yes.
Lieber: Did you?
Answer: Yes.
Lieber: What did he tell you?
Answer: What he was charged with and that he could get life in prison.
Lieber: With the charge that we have against him now, he will get life in prison and we will be back in court again in March and we will have some more charges against him.
Lieber: In one of his phone calls to you, what did he mean when he said "I've got to be strong because if I break down, then it will be like a domino effect....what did he mean by that?
Answer: I didn't ask and I don't know.
Lieber: Why did he think that they were going to be released when they went back to court on December 19?
Answer: I don't know.
Lieber: In one of his earlier conversation with you he said that they let Adrian go, but then the Judge changed her mind, what was that about?
Answer: I don't know.
Lieber: Did he have a phone of yours?
Answer: Yes.
Lieber: Why?
Answer: Because I didn't want his phone bill going to his house with my numbers on it.
Lieber: So you gave him a phone so that he could talk to you on.
Answer: Yes.
Lieber: What was that phone number?
Answer: 240-893-2503.
Lieber: Why did he change his phone number?
Answer: I don't know.
Lieber: How did you find out that he had a new number?
Answer: He called me and told me.
Lieber: Had he changed his number before?
Answer: Yes.
Lieber: Just to let you know, you will be receiving a certified letter in the mail letting you know that you were on intercept from two of his phone numbers.

Steve: What kind of car does he drive?
Answer: A Jeep Cherokee and a Toyota Sequoia.
Steve: What color are they?
Answer: Goldish brown....something like that.
Question (I don't know who asked): Does he have a friend that lives in your neighborhood?
Answer: I don't if they are friends or not, but he did know a guy in my neighborhood.
Question: What is his name?
Answer: I think it's Kevin.

It is now about 2:35 and I asked them how much longer is this going to take? Ms. Lieber again leaves the room to see if the grand jury was ready for me. While she was out of the room Stephanie and Steve continued to watch me as if they were looking for some kind of sign or something. I then started to look back at Stephanie and then she asked me " who are you more mad at, him or us? My response was "I am not mad at him, I am not mad at anyone? She also asked me if I was still running? I said sometimes. I then asked her how did she know that I run. Her smirky response was "we heard about the 10k race on intercept". She asked me if I had taken the day off work and I said no and that I really needed to get back to work because I had things that I needed to get out before the end of the day. At this time, the tall back female agent entered the room and she asked me "in another phone conversation that you had with Antoine, what do you think that he meant when he said that his wife was the only one who stood by him when he was in prison? I said, I don't know what he meant and I didn't ask. She said "do you have any relatives that have ever be in prison" and I said "no", but why did you ask me that question? She responded by saying something to the effect that I would know how the system worked (I was puzzled and didn't know what she meant and I didn't ask for clarification).

Ms. Lieber re-entered the room and told me that it was my lucky day and that they weren't going to waste the grand jury's time, or their time or my time, but they had confirmed some things that they wanted to know by talking to me and that they were going to listen to the tapes some more and if they came across anything that I wasn't being truthful about then they would have to bring perjury charges against me. She also said that if they needed to talk to me again or decided that they wanted to bring me before the grand jury, they would re-subpoena me. I then asked if they would refrain from coming to my job again, and perhaps send it in the mail. Stephanie then said "no, we have to deliver it personally". I then said "I know that I can't tell you people what to do, but would you bring it to my house". Stephanie then said that "most people don't want them coming to their house". My response to that was "well, I am not most people and I would rather you come to my house instead of my job. Ms. Lieber then said that since they had my phone numbers, they could just call me. I said fine. When I left it was about 2:55 p.m.

I was just thinking about the question that Steve asked me about Antoine giving me money for my car. If it is true that they were only listening to my calls with him from September 2, 2005 to October 25, 2005, then how could they possibly know about something that happened back in February or March because I don't recall that being the subject of any of our conversations during the above stated time period.

The questions are not in any particular order and I tried to think of everything that I could remember that they asked me.

(Exhibit #17)

USCA Case #11-5191     Document #1407743     Filed: 11/30/2012     Page 63 of 80

Case 1:07-cv-01027-RJL   Document 39-1   Filed 04/19/08   Page 46 of 118
Case 1:05-cr-00386-ESH   Document 111   Filed 04/24/2006   Page 1 of 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

APR 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Criminal No. 05-0386 (ESH) |
| | ) |
| ANTOINE JONES, *et al.*, | ) |
| | ) |
| Defendant. | ) |

### ORDER

Upon consideration of Defendant Jones' Motion for Modification of Conditions of

Detention [# 76], the government's response thereto [# 85] and supplemental filings [# 93, 96],

and defendant's Reply [# 94], as well as oral argument from both parties, it is hereby

**ORDERED** that the motion is **GRANTED** insofar as defendant should no longer be in

total lockdown, but the following conditions shall be imposed: the D.C. jail is to record

defendant's phone calls and monitor his incoming mail (with the exception of calls and mail

from his attorney, Eduardo Balarezo, and his investigator, Mark Glick); and defendant's social

visits shall be limited to his attorney, Eduardo Balarezo; his investigator, Mark Glick; and his

wife, Deniece Jones.

It is further **ORDERED** that defendant's Motion for Law Library Access [# 50], is

**DENIED** as moot.

*Ellen S Huvle*
ELLEN SEGAL HUVELLE
United States District Judge

April 24, 2006

CC:   D.C. Jail

**A166**

(Exhibit #12)

Case 1:07-cv-01027-RJL   Document 39-1   Filed 04/19/08   Page 47 of 118
Case 1:05-cr-00386-ESH   Document 113   Filed 05/05/2006   Page 1 of 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY 0 5 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,       )
                                )
                                )
                                )
          v.                    )        Criminal No. 05-0386 (ESH)
                                )
ANTOINE JONES, et al.,          )
                                )
          Defendant.            )
                                )

ORDER

Pursuant to the Court's Order of April 24, 2006 ("April 24 Order"), it is hereby

ORDERED that defendant Antoine Jones is to be placed forthwith in the general

population at the D.C. Jail, subject to the conditions set forth in the Court's April 24 Order.

Ellen S Huvelle
ELLEN SEGAL HUVELLE
United States District Judge

May 5, 2006

CC:   D.C. Jail
      U.S. Marshal

A167

(N).

Moore St
MD 20603

SE2/46

Mr. Antoine Jones
241-912
1901 D Street SE
Washington DC 20003

20003+2534

Personal
Letter

Hey Baby!

Today is Nov. 8th which means that tomorrow is our anniversary. Hopefully by the time you get this letter the judge in this case will realize all of this was a mistake and the entire matter will have been dropped already. I am trying to listen to the positive side of this and focus my energy on praying through this. It is so hard to stay focused and strong. I can't remember when I have prayed this much before. I need God so much right now just to keep me from breaking down. I can't think clearly at times and sometimes I can't stop crying. Sis Haynes and Mother Jennings invited me to come and stay with them to try to relax my nerves, my Aunt Hilda did too. As upset as I am, I can't go anywhere. I just have to stay here and deal with each day one day at a time.

①

I heard in court and the news kept saying that the club was connected, but then in court they said something different. Everyone says that black men are convicted because of the color of their skin. I don't like to listen to talk like that but when things like this happen it shows just how eager people were to destroy the club and to destroy the names of people who without even knowing the facts. This is really an ugly side of life where the press uses its influence to kill the Bleep man and I don't like what I see. They have decided to make you look guilty. Anyway, I just hope this ugly nightmare goes away quickly. I can't wait to get my life back to some sense of normalcy. I hope they don't read your mail. The thought of someone reading your mail is sickening to me.

②

A197

2002514B707     P. 27/30

Case 1:11-cv-01027-RJL   Document 39-1   Filed 04/19/08   Page 27 of 30

The reason I was so upset yesterday
is because I spoke with your
attorney and he said that they
are not going to drop the case
but they are going forward with
a trial. He also said they would
not consider releasing you on bond
before the trial ends. I just could
not stop crying. I think I won't
answer the phone when I am
upset like that. I also don't like
sending you letters with a bunch of
sobbing. So I will try to turn
this letter around now.

Antwine said he wants to transfer
to another school next year. He wants
to go to North Carolina. It sounds
okay to me but let me know
what you think about it. Actually
a change of scenery might do us
all some good.

I am sure they planted all
kind of devices in my house and
you need to not underestimate
these people. I had to take the
computer to the shop.

③

A198

Case 1:07-cv-01923-RWR Document 109-1 Filed 04/13/11 Page 7 of 118

me and Antoine around and I am
sure they planted divises at my
mothers house too. It just bothers
me because they take innocent
situations and make them into
a federal criminal case and they
have so much power over the
entire judicial systems. You just
cant afford to under estimate
these people. The agent won't
return my calls, she is holding
my car just to be mean and
I think they will do anything to
make our lives more miserable.
It just makes no sense to me.
It is just a job to them but it
is life to me and my family.
They held guns on us and I
thought they just wanted to kill
you. We were naked so it was
impossible for us to be armed. I
am trying to push those memories
from my mind. I would not
wish that nightmare on my
worst enemy.

④

A199

this entire matter to be dropped.
I have to live through this one
day at a time but I want it
to go away I don't want this
to leave me with a heart full
of bitterness or hatred. I have
to be focused and prayerful. I
hope you are praying sincerely
for us because we really
need your prayers.

Love
Niecy

**A200**

Personal
letter from wife

32(313)

Denise
(301) 843-0838
10870 Moore St
Woldorf, M.D. 20603.

Tyrone
(H.) (301) 513-9449
¢ (202)679-9611

Lawrence
(301) 613-6293

Michael
6002 Bobcat ct
Waldorf, MD 20603
301 885-0951

Phone numbers



Darrell
301-893-2765 #
202-645-3960 W

Phone
number

A189

Mental notes
for lawyer

① F~~...~~
② ~~...~~ to see ~~...~~ - Go to Mike
③ ~~...~~
④ ~~...~~
⑤ ~~...~~ Fire party + ~~...~~ Time
⑥

① Vicky Number #
② Kill's ~~...~~
✓ ③ Dec K ADDRESS, Buck Number
④ Bryant ## ——→ Bow
⑤ Ivie - Pope - 12
⑥ Deirdre, CH
⑦ Pauline
⑧ Youngin ??
⑨ Loop
⑩ Chris
   Kay Dunn. CH #

⑪ Tell Nettie mother Kevin
⑫ Called and see ~~...~~ Number?
⑬ Go ~~...~~ to ~~...~~
⑭ Called ~~...~~
⑮ ~~...~~
⑯ Called Beverly 301, 322-9046
   Get her cell Number
   Karen will have it.
⑰ RUEL BREMEA
   307-660
⑱ Father #
⑲ ~~...~~

A190

Plone numbers

1. device 301 873-9838 / 240 916-2149
2. Mike 301 885-0451
3. Adrien 301 423 0191
4. Tyrone 301 513-9149 home 202 255-4512 #285
5. Tyrone 202 679-4611
6. Lawrence 301 61 36 292
7. Clusloves 202 269-0100
8. Nickey cell
9. Antoine cell ~ 202 469-2149
10. Deb
11. Nett
12. Blueberry 301 322-9846 / Ivic
13. 307-060 Ruel Bremer

DEB 301 309090 / 202 591 1444 / 202 255 4512 #285

A. Eduardo Baltaic ~ 202 639-0999

Mike Lee 240 346 4889

202 341-9206 Nicky

West 202 Lye 479-2839

301 wheath 870-2884

1. Buck - research
2. Ivie?
3. Pline?
4. Deaurek?
5. Bow?

Donald Hunter? / Mike wife?
Kevin Ry-Guey / Donald Hunter / Annella Henson / Devon Howard / Tony B

Katlen / 202 232 1567?

note for lawyer

A201

re Deniece, 301.843 0838 - H
1240 416 2249 - C

mother
is if

called
3-0191
1009
have a
re. $4,500
at funds BUCK
it the
UGLI
BANK

VY # 240-378-0771

? Bryant - Bow
? Inie - Rotannia - Plina
? Buck
? Vickie lawyer - kills
? Getting cars back
? House Back
?
?

Please number
and notes for
lawyer

Callealein Lee 206-8519 Wander

1. Killis #base
2. Buck wash asap
3. Donald Humber ???
4. Jacynnt - Boss
5. Phone ??
6. Get car from cousin
7. Get VIP Pass For TCB & Backyard Chris
8. Fut dancelen up Here Friday with Bayond - Ivie or LA
9. Tell Derrick Ivie on Bayond to take me to can't visit
10. Dont forget to Lellikila, ... and black nephew ... Kevin is the ...
11. Called Beverly ...
12. Roel Bremes 307-060
13. Coup P = 1900 Bink - 1933
14. Tell Chris to Print a couple of VIP Pass for the Halloween Party we was doing to do

Print a couple of VIP Tickets with all of our parties

15. ...
16. Get Lawrine Jose Club levels papers

P Phone numbers needed List For lawyer

A203

② MIKE 301 885-0981-240 846 7869

③ ADRIEN 301 423 0191

④ DeB 301 809 0771, 240 387-4
WK 202 295 4510 #235     1424

⑤ TYRONE T- 301 513 9444-W
202 636 2 73-c

⑥ LAWRNCE 301-613-2-93
301 484-2442

⑦ CLUB LEVEL 202 269-0100
(Fr DINNER +

⑧ A EDUARDO BAIARCZO -LAWYER
202 639-0999

⑨ NELLE 202 391-9246 -C
301 490-2584 -W    WB
LA cell 202 492-3342/202 409-3383

⑩ FATHER 202 232-1562  ??

⑪ Lye-resident 202 409-2831
202 492.3342

⑫ BEVERLY 301 322 9086 -H
440 353.6542 c  ???

⑬ I VIE    vivian
240 399-0271   301 638-5081

⑭ BRYANT    PAMELA 301 792-3063

⑮ P-ine    DARRELL 301 893 3246
DK-202 645 3960

⑯ Lil
a some cell

⑰ Lou cell 202 226-8519

⑱ BUCK LJ  357972    301 373/
2884365

⑲ VICKY-240 475 1125
(KRIS Aquien)

⑳ DERRICK    BUCK 202
256-1372

㉑ KRAZY    VICK 72-0
475-1125

㉒ CHRIS

㉓ Youngin-Recco -

Phone numbers
and mental notes.
for lawyer

**A204**

espanol Legal #58
Fitzsurral
fizwel 2/598
2003

2/49/
1151
LORO20
Dustin

Phone
number

A205



Phone
numbers

A206